691 A.2d 321

JOANNE PAYTON, PLAINTIFF–RESPONDENT, v. NEW JERSEY TURNPIKE AUTHORITY, DEFENDANT–APPELLANT, AND MICHAEL STANKOWITZ AND ROBERT C. GEBERTH, INDIVIDUALLY AND AS EMPLOYEES OF THE NEW JERSEY TURNPIKE AUTHORITY, DEFENDANTS.

Argued January 7, 1997—Decided March 26, 1997.

528

530

*Michael K. Furey* argued the cause for appellant (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Furey* and *James P. Anelli*, on the briefs).

*Patricia M. Talbert* argued the cause for respondent (*Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein*, attorneys).

*Nancy Erika Smith* submitted a brief on behalf of amici curiae National Employment Lawyers Association, New Jersey Employment Lawyers Association and National Organization for Women of New Jersey (*Smith Mullin*, attorneys; *Ms. Smith, Christopher P. Lenzo* and *Fredric J. Gross*, on the brief).

*Richard C. Mariani* submitted a brief on behalf of amicus curiae The New Jersey Chambers of Commerce (*Apruzzese, McDermott, Mastro & Murphy*, attorneys; *Mr. Mariani* and *Kimberly E. Robertson*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In this case, an employee is suing her employer and two of her supervisors for sexual harassment under the Law Against Discrimination. She contends that her supervisors harassed her and that her employer failed to respond adequately to her complaints. Although the employer subsequently disciplined the supervisors after determining that the employee's claims were meritorious, the employee asserts that the employer's allegedly inadequate response to her complaints contributed to the harm that she suffered and consequently entitles her to damages.

The general question that we must consider is the nature and extent of the pretrial discovery that an employee claiming to have been sexually harassed is entitled to obtain for the purpose of establishing the employer's liability based on its alleged failure to respond to her complaints of sexual harassment. The more specific issues that must be addressed in this case relate to whether various documents and records pertaining to the employer's handling and disposition of the employee's complaints of sexual harassment, including its internal investigation, may be made available through discovery and the extent to which concerns based on confidentiality and privilege may preclude or limit the discovery of such materials.

I

Plaintiff Joanne Payton began working as a maintenance records clerk for defendant New Jersey Turnpike Authority in November 1990. Shortly after she started, two of her supervisors, Robert Geberth and Michael Stankowitz (the two highest ranking administrators in her unit), allegedly began to sexually harass her. According to plaintiff's complaint, they harassed her in the following manners:

(a) Defendant Geberth commented about Plaintiff's clothing[,] grabbing the bottom of her skirt and pulling it down, stated her clothes look like she is "wearing pajamas," put his hand around the Plaintiff, on her shoulder or on her knee and called Plaintiff into his office directing that she turn around so that he could look at her;

(b) Defendant Stankowitz told Plaintiff on several occasions that he was "horny" and wanted "to get laid," referred to Plaintiff's breasts and said to her "just one time," tried to look down Plaintiff's blouse and, during lunch at a restaurant, took the Plaintiff's hand and put it between his legs;

(c) During the office holiday luncheon on or about December 1993, Defendants Geberth and Stankowitz gave Plaintiff a "baby doll" nightgown. Defendant Geberth insisted that she open the gift in front of her office co-workers who were attending the luncheon; and

(d) On or about July, 1993, Defendant Geberth slapped a female co-worker on the buttocks in the presence of several co-workers, including the Plaintiff.

For several years, plaintiff tolerated the harassment, but in September 1994, she filed an internal complaint with defendant.

During the approximately seven months following plaintiff's complaint, the alleged harassment continued, and defendant took no remedial action against the supervisors. On March 10, 1995, believing that defendant would not resolve the situation, plaintiff brought suit in the Superior Court, Law Division against defendant and the supervisors, alleging with regard to defendant that it was vicariously liable under the Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1 to –42, for the supervisors' conduct.

On April 26, 1995, defendant announced that it had disciplined the two supervisors, having suspended them without pay, demoted them, and reduced their salaries. Five days later, in answer to plaintiff's complaint, defendant raised these actions as an affirmative defense to vicarious liability, claiming that, by its response to her complaint of sexual harassment, it had neither participated in nor acquiesced in the harassment. Defendant later represented, through a privileged document log, that its Equal Employment Opportunity Officer ("EEO Officer") had made initial findings about the complaint on December 8, 1994 and (together with in-house counsel) had issued a final investigative report on March 14, 1995, four days after plaintiff had filed suit. It also asserted that, on April 13, 1995, its Sexual Harassment Advisory Committee had completed a confidential review of the EEO Officer's report, including remedial recommendations, and that, on April 25, 1995, defendant's commissioners had convened an executive session

regarding the matter, during which they presumably had discussed the report and determined the appropriate sanctions.

In order to gauge the timeliness and thoroughness of defendant's actions (and hence the validity of defendant's affirmative defense that it had effectively remedied the harassment), plaintiff sought discovery of materials relating to the investigation and executive session. Specifically, she demanded "[a]ll documents relating to any investigation that was conducted by or for the defendant having to do with the plaintiff and her employment with the defendant[,] ... [a]ll documents relating to any investigation that was conducted by or for the defendant having to do with the plaintiff and her administrative complaint alleging sexual harassment[, and] ... [a]ny minutes, transcriptions, reports, supporting documents, agendas, [and] recordings related to [the Commissioners' April 25, 1995] meeting."

Defendant moved for a protective order exempting all of the requested documents from discovery. It also asked the court to seal the record. Plaintiff opposed the motion and, in the alternative, moved to strike the affirmative defense if defendant were not required to produce the documents.

The Law Division, without examining any of the documents *in camera,* granted the protective order in its entirety, thus removing from the discovery process all documents relating to the investigation. In support of its broad order, the court cited the public policy of confidentiality embodied in the LAD. It also relied, to a lesser degree, on the attorney-client privilege and the so-called privilege of self-critical analysis.

Plaintiff then sought interlocutory relief in the Appellate Division, which granted leave to appeal and vacated the protective order. 292 *N.J.Super.* 36, 678 *A.*2d 279 (1996). Relying on our holding in *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 626 *A.*2d 445 (1993), the court concluded that plaintiff was at least entitled to discover information relating to "the extent of the Authority's investigation, the timing of the Authority's investigation relative to the date of plaintiff's complaint to the department, the information

gleaned by the Authority from its investigation, the Authority's evaluation of the information, and the action taken by the Authority." 292 *N.J.Super.* at 46, 678 *A.*2d 279. The Appellate Division instructed the trial court to inspect the documents at issue *in camera* and to make appropriate redactions in order to accommodate concerns about confidentiality and privilege. *Id.* at 53–54, 678 *A.*2d 279.

We granted defendant's motion for leave to appeal, 146 *N.J.* 495, 683 *A.*2d 198 (1996), and we now affirm.

## II

■ New Jersey's discovery rules are to be construed liberally in favor of broad pretrial discovery. *Jenkins v. Rainner*, 69 *N.J.* 50, 56, 350 *A.*2d 473 (1976) ("Our court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts."); *Catalpa Investment Group, Inc. v. Zoning Bd. of Adjustment*, 254 *N.J.Super.* 270, 273, 603 *A.*2d 178 (Law Div.1991); *Martin v. Educ. Testing Serv., Inc.*, 179 *N.J.Super.* 317, 327, 431 *A.*2d 868 (Ch.Div.1981). Under the rules, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . ." *R.* 4:10–2(a). "Relevant evidence," although not defined in the discovery rules, is defined elsewhere as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401.

■ In determining whether materials relating to defendant's internal investigation are discoverable, therefore, we must evaluate, as an initial matter, their relevance to the issues raised in this litigation. We look to *Lehmann, supra*, 132 *N.J.* 587, 626 *A.*2d 445, for guidance in this regard. In *Lehmann*, the plaintiff brought suit under the LAD, alleging hostile work environment arising from sexual harassment at the hands of her supervisor. *Id.* at 595–99, 626 *A.*2d 445. She did not simply sue the actual harassers, however, instead naming her employer and alleging

that it was vicariously liable; among her allegations was the employer's supposedly deficient investigation of her internal complaints. *Id.* at 599, 626 *A*.2d 445.

We held in *Lehmann* that the LAD's prohibition of sex discrimination created causes of action for sexual harassment and hostile work environment resulting from that harassment. *Id.* at 600–15, 626 *A*.2d 445. We then reached the difficult issue of employer liability under those circumstances and concluded that employers could be vicariously liable in damages under an agency theory for sexual harassment committed by employees, *id.* at 619–20, 626 *A*.2d 445, and that such liability would be governed by a variable standard depending on the state of mind of the employer. *Id.* at 619–26, 626 *A*.2d 445. Employers that were negligent in failing to take effective steps to end sexual harassment would be liable for compensatory damages, *id.* at 621–23, 626 *A*.2d 445, while those that actually participated in or were willfully indifferent to the wrongful conduct would be liable for punitive damages. *Id.* at 624–25, 626 *A*.2d 445.

■ Of particular importance in *Lehmann,* we noted that an employer's liability for its own negligence in failing to take effective remedial measures was a form of direct liability in addition to vicarious liability. *Id.* at 623, 626 *A*.2d 445. We stated that

> [w]hen an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.... "Effective" remedial measures are those reasonably calculated to end the harassment. The reasonableness of an employer's remedy will depend on its ability to stop harassment by.the person who engaged in harassment.
>
> [*Ibid.* (quotations and citations omitted).]

Thus, we determined that an employer that failed to take *effective* remedial measures against a harassing employee was, in essence, liable for its own conduct.

■ While the effectiveness of an employer's remedial steps relates to an employee's claim of liability, it is also relevant to an

employer's affirmative defense that its actions absolve it from all liability. *See infra* at 540–41, 691 A.2d at 328–29. Thus, the efficacy of an employer's remedial program is highly relevant to both an employee's claim against the employer and the employer's defense to liability.

Given the dual significance of the effectiveness of an employer's remedial actions, the critical interpretive question that confronts us in this case is the understanding of "effective" as the standard by which to evaluate the adequacy of an employer's response to a complaint of sexual harassment. If, as defendant argues, the effectiveness of a remedial scheme is measured solely by its final outcome, namely, the ultimate sanction imposed, then documents relating to the internal investigatory process leading up to the sanction are irrelevant to the harassment and hostile-work-environment claims against the employer and hence not discoverable. However, if effectiveness is gauged by the *process* of the investigation—including timeliness, thoroughness, attitude toward the allegedly harassed employee, and the like—as well as by the result of the investigation, then the documents are clearly relevant and discoverable.

We are persuaded that the "effective" remedial measures emphasized in *Lehmann* include the process by which the employer arrives at the sanctions that it imposes on the alleged harasser. If effective measures are those "reasonably calculated to end the harassment," *Lehmann, supra,* 132 *N.J.* at 623, 626 A.2d 445, then neither a court nor a jury can evaluate effectiveness without considering the entire remedial process. As the Appellate Division noted:

[The] timeliness of an employer's response is an important element in determining the effectiveness of an anti-harassment program.... A slow response may be perceived as a reluctant response and call into question the *bona fides* of an employer's anti-harassment program. Similarly, an investigation, though timely instituted, may be pursued half-heartedly and unduly prolonged. On the other hand, a timely, vigorously pursued inquiry that corroborates the victim's accusations will compromise a well-designed anti-harassment program, if the employer drags its feet in acting on the corroborative evidence.

[292 *N.J.Super.* at 47, 678 A.2d 279 (citation omitted).]

■ Numerous federal courts have adopted this position as well. *See, e.g., Guess v. Bethlehem Steel Corp.,* 913 *F.*2d 463, 465 (7th Cir.1990); *Harding v. Dana Transport,* 914 *F.Supp.* 1084, 1094 (D.N.J.1996); *Van Horn v. Elbeco, Inc.,* No. CIV. A. 94–2720, 1996 *WL* 385630, at *9 (E.D.Pa. July 10, 1996); *Stewart v. Weis Markets, Inc.,* 890 *F.Supp.* 382, 390 (M.D.Pa.1995); *Giordano v. William Paterson College,* 804 *F.Supp.* 637, 643–44 (D.N.J.1992); *Foster v. Township of Hillside,* 780 *F.Supp.* 1026, 1039 (D.N.J.), *aff'd,* 977 *F.*2d 567 (3d Cir.1992); *Zabkowicz v. West Bend Co.,* 589 *F.Supp.* 780 (E.D.Wis.1984). Federal jurisprudence in this area is particularly relevant because the LAD draws significantly from federal antidiscrimination law. *See Lehmann, supra,* 132 *N.J.* at 617–19, 622–23, 626 *A.*2d 445.

In this case, full discovery may enable plaintiff to support and to advance her argument that defendant's delay in investigating her complaint and its delay in preparing a report until four days after she had filed this lawsuit reflected an unwillingness promptly to investigate and to remediate her allegations of sexual harassment. The claim is based on an employer's obligation to create an effective investigatory and remedial process that does not discourage employees from exercising their statutory rights. *See Lehmann, supra,* 132 *N.J.* at 623, 626 *A.*2d 445; *cf. Romano v. Brown & Williamson Tobacco Corp.,* 284 *N.J.Super.* 543, 665 *A.*2d 1139 (App.Div.1995) (in context of claim of retaliation against employee, inquiring into employer's internal reaction to employee's complaint of employer's illegal conduct).

■ In short, a remedial scheme that reaches the correct result through a process that is unduly prolonged or that unnecessarily and unreasonably leaves the employee exposed to continued hostility in the workplace is an ineffective remedial scheme. Such a process, in reality, indirectly punishes employees with the temerity to complain about sexual harassment and cannot constitute "effective" remediation. Indeed, such a scheme can be viewed only as an attempt by the employer to discourage employees from coming forward and utilizing the employer's remedial process in

the first place. Because of the importance of the remedial process in evaluating an employer's good faith in counteracting and attacking sexual harassment and in eliminating hostile work environment, we conclude that materials relating to an employer's internal investigation of alleged sexual harassment are relevant to a claim under the LAD and hence generally discoverable.

## III

Although relevance creates a presumption of discoverability, that presumption can be overcome by demonstrating the applicability of an evidentiary privilege. *R.* 4:10–2(a). A privilege reflects a societal judgment that the need for confidentiality outweighs the need for disclosure. *Hague v. Williams,* 37 *N.J.* 328, 335, 181 *A.*2d 345 (1962); *Wylie v. Mills,* 195 *N.J.Super.* 332, 337, 478 *A.*2d 1273 (Law Div.1984). Despite the existence of privileges, however, our desire to attain truth through the adversarial process has led to a disfavoring of such a categorical approach to concerns about confidentiality, *see United States v. Nixon,* 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L. Ed.*2d 1039, 1065 (1974); *Dixon v. Rutgers Univ.,* 110 *N.J.* 432, 446–47, 541 *A.*2d 1046 (1988); *State v. Briley,* 53 *N.J.* 498, 505–06, 251 *A.*2d 442 (1969); *Hague, supra,* 37 *N.J.* at 335, 181 *A.*2d 345; *State v. Szemple,* 263 *N.J.Super.* 98, 101–02, 622 *A.*2d 248 (App.Div.1993), *aff'd,* 135 *N.J.* 406, 640 *A.*2d 817 (1994), in favor of case-by-case balancing. *See Loigman v. Kimmelman,* 102 *N.J.* 98, 103–04, 505 *A.*2d 958 (1986).

The disfavored status of privileges is the backdrop against which we analyze each of the grounds that defendant asserts to justify exclusion of its relevant investigatory materials from the discovery process. We note that our analysis of the various claims of privilege contains two common themes, namely, the strong public interest, embodied in the LAD, of eliminating discrimination and harassment and the balancing of that interest against various interests in confidentiality.

A.

Defendant contends that our decision in *Lehmann*, several decisions of the United States Supreme Court, and former-Governor Florio's issuance of Executive Order No. 88 combine to create a "public policy of confidentiality." The trial court relied heavily on this rationale in granting the protective order:

> The Court would have to put on blinders to fail to recognize the fact that those who come forward in terms of this type of investigation do so with an understanding that any communication would be privileged.... I am satisfied that the paramount interest in terms of the law against discrimination relates to the public policy in promoting the purpose of the act [i.e., confidentiality and eliminating underreporting]. And to undermine that with an opening of the investigative process involved ... would be inappropriate and contrary to the purpose of the intent.... I am satisfied ... that information that is given under such cover should be maintained under such cover unless there are compelling reasons to dictate otherwise.

Although defendant does not use the word "privilege" in this context, it effectively urges the creation of a privilege that precludes discovery of "confidential" materials relating to internal sexual-harassment investigations.

Both this Court, in *Lehmann, supra*, 132 *N.J.* at 622, 626 *A.*2d 445, and the United States Supreme Court, in *Meritor Savings Bank v. Vinson*, 477 *U.S.* 57, 72–73, 106 *S.Ct.* 2399, 2408, 91 *L. Ed.*2d 49, 63 (1986), have allowed employers to avoid liability for sexual harassment by implementing effective procedures to combat this evil internally, thus encouraging victims to come forward and to report prohibited conduct. Moreover, then-Governor Florio, by executive order, mandated a review of anti-sexual-harassment procedures throughout the state government in order to make them "more effective and sensitive to the needs of victims of sexual harassment." Exec. Order No. 88, 25 *N.J.R.* 1799(b) (1993). The Department of Personnel, in response to the executive order, recommended that investigators of sexual harassment be cognizant of confidentiality in order to encourage victims to report allegations and to elicit candid statements from all involved. Review Committee on Sexual Harassment, New Jersey Department of Personnel, *People Working Together: A Report on Sexual*

*Harassment* (1993). We recognized the importance of confidentiality in this context in *In re Seaman*, 133 *N.J.* 67, 90–91, 627 *A.*2d 106 (1993).

We reaffirm our belief that confidentiality is an important component of any policy designed to maximize reporting of alleged sexual harassment and to ensure the accuracy of ensuing investigations into such allegations. However, whether the importance of confidentiality leads to the creation of a privilege to refuse to produce documents relating to internal investigations implicates other important counterbalancing considerations. In *Dixon, supra*, 110 *N.J.* at 446–59, 541 *A.*2d 1046, we were confronted with a similar request to convert confidentiality concerns into a qualified privilege, in that case, one that would have precluded discovery of materials related to peer evaluation for university tenure determinations. We declined to create a privilege in that context, *ibid.*, and the reasoning that we employed there is apposite in the context of this case.

In refusing, in *Dixon*, to create a qualified privilege in the peer-review situation, we distinguished the cases in which we had created such privileges, emphasizing that in those cases, the Court had been required to "balance *private* interests in disclosure against *public* interests in confidentiality," whereas in the case before it the Court had to "balance the *public* interest in maintaining a confidential peer review process that protects the university's academic freedom against our State's strong *public* policy favoring disclosure and eradication of discriminatory treatment in employment." *Id.* at 451, 541 *A.*2d 1046. We then determined that the powerful legislative policy embodied in the LAD of eliminating discrimination overrode the interest in maintaining an iron curtain around the peer-review process. *Id.* at 451–54, 541 *A.*2d 1046.

As in *Dixon*, and unlike the cases in which we have recognized new privileges, we are confronted with two competing public interests, as opposed to a private interest in disclosure that is outweighed by a strong public interest in confidentiality. Unlike

*Dixon*, however, the two asserted interests in this case—disclosure to ensure that employers maintain effective sexual-harassment procedures and nondisclosure to enable employers to maintain effective procedures that encourage reporting and candid statements by all involved—both claim to strive for the same goal, namely, an end to sexual harassment.

Because those advocating disclosure and those advocating nondisclosure pledge allegiance to the same goal—eradication of sexual harassment—while arguing for different methods of achieving that goal, we cannot simply fall back on the maxim that "[t]he eradication of the cancer of discrimination has long been one of our State's highest priorities," *id.* at 451, 541 *A.*2d 1046 (internal quotations omitted) (quoting *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652, *cert. denied*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988)), to resolve the conflict. Instead, we must determine which method of achieving the unanimously supported goal will best achieve that goal.

We conclude that the appropriate balance is not to create a blanket privilege arising from legitimate general concerns for confidentiality, but rather to recognize a conditional privilege that applies selectively depending on the nature of the materials involved. In its application, the trial court may supervise discovery of the relevant internal investigatory materials and require procedures that protect the confidentiality of those involved in the investigation if a loss of confidentiality would otherwise undermine the efficacy of investigations. Such procedures, short of suppression, may include redaction, issuance of confidentiality or gag orders, and sealing of portions of the record. Only in truly extreme cases should the need for confidentiality require suppression of specific documents.

We believe that those procedures are preferable to a privilege because confidentiality concerns in this context are less acute as a result of the limited number of participants who will benefit from a secretive process. Obviously, a plaintiff waives her confidentiality interest by bringing suit. Moreover, the employer

and any other defendants, namely, the actual harassers, already have been named in the suit, and other material witnesses already may be well-known. Consequently, the only persons who benefit from confidentiality in this type of case are witnesses who may not be known or whose cooperation otherwise may not be forthcoming, and their identities can be protected through redaction. Furthermore, there may be situations in which such witnesses no longer have a continuing need for confidentiality or may be deemed to have relinquished or waived their interest in confidentiality.

The Appellate Division addressed the concern about witness confidentiality, and we agree with its observation that "it may not be possible to protect [witnesses'] identities throughout the entire course of the litigation consistent with plaintiff's right to the opportunity to establish a cause of action...." 292 *N.J.Super.* at 48, 678 *A.2d* 279. Unfortunately, even the best efforts to maintain confidentiality may fail during the lifespan of a lawsuit. Yet, we must rely on the creativity of the trial court and the good faith of the parties to guard against unnecessary revelation and thus to protect the integrity of the investigatory process.[1]

---

[1] We note that codefendants Geberth and Stankowitz have filed counterclaims and cross-claims against plaintiff (for defamation and other assorted theories) and defendant (for indemnification and contribution). Given the potential claims of the codefendants, they may at some point request access to the investigatory files. Indeed, Geberth's counsel, in supporting defendant's request for the protective order, specifically reserved the right to request the materials in the future for Geberth's claims.

In rejecting defendant's claim of privilege based on confidentiality, we express no opinion about the merits of an identical claim by defendant in the future should one or both of the codefendants request the materials. In such an eventuality, the trial court would have to balance the codefendants' private interest in being compensated for defamation or some other claim and the public interest in confidentiality of harassment investigations in order to encourage candid statements and to prevent retaliation. *See Korostynski v. State Div. of Gaming Enforcement,* 266 *N.J.Super.* 549, 558–59, 630 A.2d 342 (App.Div.1993) (noting that private interest in disclosure may be outweighed by public interest in confidentiality even if public interest in disclosure, such as enforcement of antidiscrimination laws, may outweigh the same public interest in confidentiality).

We therefore conclude that, regarding confidentiality, the balance weighs in favor of disclosure with appropriate procedures to ensure justified confidentiality in light of plaintiff's paramount interest in obtaining relevant materials.

B.

Defendant also relies on the so-called privilege of self-critical analysis in justifying the protective order. The trial court relied in part on that privilege in granting the order, while the Appellate Division rejected its applicability because of the importance of the materials to plaintiff's case. 292 *N.J.Super.* at 48–49, 678 *A.*2d 279. Both courts, as have a number of lower courts, assumed the existence of this broad privilege in New Jersey despite the fact that this Court never actually has adopted it, only having referred to it without expressing an opinion as to its validity. *Loigman, supra,* 102 *N.J.* at 107, 505 *A.*2d 958; *McClain v. College Hosp.,* 99 *N.J.* 346, 359, 492 *A.*2d 991 (1985).

The privilege of self-critical analysis exempts from disclosure deliberative and evaluative components of an organization's confidential materials. *Tharp v. Sivyer Steel Corp.,* 149 *F.R.D.* 177, 179–80 (S.D.Iowa 1993). According to one court, "[t]he primary justification for this privilege is the encouragement of candor and frankness toward the ends of discovering the reasons for past problems and preventing future problems." *Korostynski, supra,* 266 *N.J.Super.* at 557, 630 *A.*2d 342. Although some courts have rejected the privilege, *e.g., Etienne v. Mitre Corp.,* 146 *F.R.D.* 145, 148–49 (E.D.Va.1993); *Siskonen v. Stanadyne, Inc.,* 124 *F.R.D.* 610, 611–12 (W.D.Mich.1989); *Hardy v. New York News, Inc.,* 114 *F.R.D.* 633, 641–43 (S.D.N.Y.1987), others have adopted it. *E.g., In re Crazy Eddie Sec. Litig.,* 792 *F.Supp.* 197, 205–06 (E.D.N.Y.1992); *Roberts v. Carrier Corp.,* 107 *F.R.D.* 678, 684–85 (N.D.Ind.1985); *Bredice v. Doctors Hosp., Inc.,* 50 *F.R.D.* 249, 251 (D.D.C.1970), *aff'd,* 479 *F.*2d 920 (D.C.Cir.1973).

Several lower courts in this State have adopted the privilege and granted seemingly absolute protection to evaluative and deli-

berative portions of organizations' files. *Korostynski, supra,* 266 *N.J.Super.* at 557, 630 *A.*2d 342; *Bundy v. Sinopoli,* 243 *N.J.Super.* 563, 580 *A.*2d 1101 (Law Div.1990); *Wylie, supra,* 195 *N.J.Super.* 332, 478 *A.*2d 1273. Others have accommodated the confidentiality concerns arising from potential disclosure of deliberative and evaluative processes by employing a balancing test instead of a more rigid privilege. *Red Bank Register, Inc. v. Board of Educ.,* 206 *N.J.Super.* 1, 10–11, 501 *A.*2d 985 (App.Div.1985); *Hussain v. Gardner,* 264 *N.J.Super.* 208, 210–12, 624 *A.*2d 99 (Law Div.1993); *Asbury Park Press, Inc. v. Borough of Seaside Heights,* 246 *N.J.Super.* 62, 67–72, 586 *A.*2d 870 (Law Div.1990).

We decline to adopt the privilege of self-critical analysis as a full privilege, either qualified or absolute, and disavow the statements in those lower court decisions that have accorded materials covered by the supposed privilege near-absolute protection from disclosure. Instead, we perceive concerns arising from the disclosure of evaluative and deliberative materials to be amply accommodated by the "exquisite weighing process," *Loigman, supra,* 102 *N.J.* at 108, 505 *A.*2d 958 (quoting *Beck v. Bluestein,* 194 *N.J.Super.* 247, 263, 476 *A.*2d 842 (App.Div.1984)), that our courts regularly undertake when determining whether to order disclosure of sensitive documents in a variety of contexts. *See Hammock v. Hoffmann–LaRoche, Inc.,* 142 *N.J.* 356, 381, 662 *A.*2d 546 (1995) ("'[A] flexible balancing process adaptable to different circumstances must be conducted to determine whether the need for secrecy substantially outweighs the presumption of access."). In fact, we view concerns about revelation of self-criticism to be a subset of the more generalized confidentiality concerns that we already have addressed and that we have refused to protect with an absolute or qualified privilege. *Supra* at 540–44, 691 *A.*2d at 328–30. Our determination in this respect is especially appropriate given our holding in *Dixon* that we particularly disfavor privileges in the employment-discrimination context. *Dixon, supra,* 110 *N.J.* at 451–54, 541 *A.*2d 1046.

Self-critical analysis, although deserving of substantial consideration when a court balances a party's need to know against another party's need for confidentiality, is not qualitatively different from other confidential information, and thus does not require the protection of a broad privilege as opposed to a balancing of interests. Although both the courts and the Legislature have classified certain confidential communications as qualitatively different and thus deserving of an evidentiary privilege, *e.g.*, *N.J.R.E.* 505 (psychologist privilege); *N.J.R.E.* 506 (physician-patient privilege); *N.J.R.E.* 508 (newsperson's privilege); *N.J.R.E.* 511 (cleric-penitent privilege); *State v. Toscano*, 13 *N.J.* 418, 424–25, 100 *A.*2d 170 (1953) (attorney-client privilege), such privileges are rooted in our jurisprudential traditions and reflect a firm societal commitment to preserving particular confidences even at the expense of truth. Given the presumption against the creation of new privileges and the potential breadth of privileging self-critical analysis, we do not join those courts that have adopted the privilege.

Of course, as we already have noted, confidentiality concerns surrounding communications consisting of self-critical analysis, under certain rare circumstances, may outweigh the need for disclosure. Our rejection of the embodiment of such concerns in an evidentiary privilege should not be interpreted as denigrating the importance of candid deliberation and self-criticism. As the court stated in *Wylie, supra:*

> Valuable criticism can neither be sought nor obtained nor generated in the shadow of potential or even possible public disclosure. It is not realistic to expect candid expressions of opinion or suggestions as to future policy or procedures in an air of apprehension that such statements may well be used against one's colleague or employer in a subsequent litigated matter. The purpose of an investigation intended to seek criticism ... of then existing policy or procedure is self-improvement. The value of the investigation is questionable if the input is not reliable. It is clear that the reliability of the input in this situation varies inversely with the risk of disclosure of the input or resulting criticisms.
>
> [195 *N.J.Super.* at 340, 478 *A.*2d 1273.]

However, despite our recognition of the forcefulness of that argument, we are not as confident as the court in *Wylie* that

*absolute* confidentiality is always essential to encourage frank, productive self-evaluation. It is not so clear that disclosure inevitably will discourage candid self-criticism. As the court noted in *Tharp, supra,* in the employment context:

> Permitting disclosure of an employer's self-critical analyses of its equal employment efforts may actually cause [an employer] to engage in a more honest assessment of its efforts because flaws in those analyses may be brought to light in civil litigation. The sunshine of public scrutiny would thus act as a catalyst to promote, not inhibit, employers to engage in full and candid equal employment assessments.... [A] weakly worded, unimaginative, and unaggressive analysis ... may be more damning than a candid evaluation recognizing a company's weaknesses and expressing a serious commitment to overcome those weaknesses. [149 *F.R.D.* at 183 n. 13, 184 n. 16 (citation omitted).]

*See also* Louis L. Chodoff, *Conducting a Sexual Harassment Investigation, N.J. Labor and Emp. L.Q.,* Winter 1997, at 4 (advising employers, in light of recent legal trend toward requiring disclosure of internal sexual-harassment investigatory materials, to conduct candid, thorough, and efficient investigations in order to avoid liability).

Moreover, as observed by the Appellate Division, when a deliberating body is required by law to prepare an honest report, replete with self-evaluation, we do not assume that that body will shirk its responsibilities in order to hide the truth. 262 *N.J.Super.* at 48–49, 619 *A.*2d 1037 (noting legal duty of employer to respond effectively to allegations of sexual harassment); *CPC Int'l, Inc. v. Hartford Accident & Indem. Co.,* 262 *N.J.Super.* 191, 195–204, 620 *A.*2d 462 (Law Div.1992) (rejecting application of privilege of self-critical analysis because of legal duty to prepare environmental report, which reduced the risk of deterring candid self-criticism through disclosure); *Asbury Park Press, supra,* 246 *N.J.Super.* at 69–70, 586 *A.*2d 870 (stressing legal duty of police officer to prepare accurate, honest investigatory report regardless of potential disclosure).

Given these competing views of human nature and institutional and organizational conduct, as well as the influence of legal rules on actors, we believe that case-by-case balancing is much more appropriate in accommodating self-critical analysis than is a *per se*

privilege. That approach comports with our preference for balancing, as opposed to categorical exclusionary rules, when addressing confidentiality concerns that arise during litigation. For example, we have noted, in the context of the common-law right of access to public documents, that our cases do not "sustain an absolute privilege of secrecy for all such investigatory materials.... A court should balance, in each case, the individual's right to the information against the public interest in the confidentiality of the file." *Loigman, supra,* 102 *N.J.* at 103–04, 505 *A.*2d 958; *see also Home News v. State Dep't of Health,* 144 *N.J.* 446, 456, 677 *A.*2d 195 (1996) (disapproving of *per se* nondisclosure rule for cause-of-death information on death certificates and reasoning that "[t]hat type of blanket prohibition is not consistent with the balancing approach mandated by the common law"); *McClain, supra,* 99 *N.J.* at 359–61, 492 *A.*2d 991 (balancing interests in determining whether to order disclosure of confidential investigative materials that reflected deliberative processes).

Although trial courts should accord significant weight to self-critical analysis and although confidentiality concerns about such information at times may outweigh competing interests in disclosure (especially if the information is obtainable through other sources), certain interests in disclosure are strong enough, in their reflection of important public policies, to outweigh such confidentiality concerns under most, if not all, circumstances. *See Tharp, supra,* 149 *F.R.D.* at 181–85 (holding that privilege of self-critical analysis did not apply in employment-discrimination cases, in part, because "disclosure of employers' 'self-critical analysis' materials may play a crucial function in civil litigation to eradicate discrimination that exists in the work place"); *Korostynski, supra,* 266 *N.J.Super.* at 558–59, 630 *A.*2d 342 (recognizing that elimination of discrimination was a weightier interest than most private interests); *CPC Int'l, supra,* 262 *N.J.Super.* at 195–204, 620 *A.*2d 462 (ordering disclosure of corporation's environmental reports because of strong public interest in disclosure of private documents relating to environmental protection).

We recognized one such public policy in *Dixon*, where we stressed the paramount public interest in the eradication of discrimination, an interest that outweighed the interest in confidential communications in the tenure process. *Dixon, supra*, 110 *N.J.* at 451–54, 541 *A.2d* 1046. We then stated that in determining whether to disclose documents relating to a discrimination claim, the trial court must "satisfy itself that the discrimination charge is valid and the material requested is relevant.... By requiring the plaintiff to demonstrate that the claim is valid and the material relevant, we intend to place only a modest burden on the plaintiff." *Id.* at 455, 541 *A.2d* 1046.

Paralleling its argument about the asserted public policy of confidentiality, defendant contends that its interest in nondisclosure of its self-criticism is also reflective of the public policy of eradicating discrimination, thus weighing against disclosure. Although this particular interest in nondisclosure is more substantial than many other interests, for the reasons previously advanced, *supra* at 541–43, 691 *A.2d* at 329–30, we believe that the balance, assuming a valid claim and relevance, is normally best struck in favor of disclosure. As we described in *Dixon, supra*, however, acknowledging the need to order disclosure does not end the inquiry. Instead

[b]efore giving the plaintiff access to the confidential materials ... the trial court should take various measures designed to minimize intrusion into their confidentiality. In this connection, we rely on practical, common-sense applications of rules of discovery that are familiar to trial courts in order to resolve most of the problems of confidentiality.... Although the protective measures a trial court may choose to employ will vary according to the circumstances of each case, we recommend that compelled disclosure of confidential ... materials be accompanied by a protective order that limits access to persons directly involved in the case.

[110 *N.J.* at 456, 541 *A.2d* 1046 (quotations and citations omitted).]

Consequently, we reject the privilege of self-critical analysis in favor of a case-by-case balancing approach. Because of the powerful public interest in eradicating discrimination and sexual harassment, we believe that the balance generally will favor disclosure in this type of case, although there may be specific documents of such limited relevance or of such high sensitivity

that the balance will favor nondisclosure. If a trial court determines that disclosure is warranted, which will normally be the case in discrimination lawsuits, it should take adequate protective measures to ensure maximal confidentiality given the necessity of disclosure.

## C.

Defendant maintains that the attorney-client privilege protects the entire investigatory process because attorneys employed by defendant participated in the investigation. We disagree with that blanket contention and instead agree with the Appellate Division that the record is currently insufficient to resolve this issue. Accordingly, we require the trial court on remand to "review the documents *in camera* in light of *Lehmann*, the principles applicable to the attorney-client privilege, and the need to shield the identities of witnesses who provided information to the Authority" and then to "make specific determinations regarding plaintiff's access to them, including an expression of reasons for the court's rulings." 292 *N.J.Super.* at 52–53, 678 *A.*2d 279. In so doing, the court will have to determine the exact role that an attorney played regarding each particular document for which the privilege is asserted. Despite our inability to dispose of this claim in its entirety, we provide some guidance to the trial court on the standards that it should apply in this inquiry.

While an organization or corporation like defendant can be a "client" for purposes of the privilege, *N.J.R.E.* 504(3); *Upjohn Co. v. United States,* 449 *U.S.* 383, 395, 101 *S.Ct.* 677, 685, 66 *L. Ed.*2d 584, 595 (1981); *In re Grand Jury Subpoenas,* 241 *N.J.Super.* 18, 28–29, 574 *A.*2d 449 (App.Div.1989); *In re State Comm'n of Investigation,* 226 *N.J.Super.* 461, 544 *A.*2d 893 (App. Div.), *certif. denied,* 113 *N.J.* 382, 550 *A.*2d 484 (1988), a fine line exists between an attorney who provides legal services or advice to an organization and one who performs essentially nonlegal duties. An attorney who is not performing legal services or providing legal advice in some form does not qualify as a "lawyer"

for purposes of the privilege. Thus, when an attorney conducts an investigation not for the purpose of preparing for litigation or providing legal advice, but rather for some other purpose, the privilege is inapplicable. *United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 563, 483 *A.*2d 821 (App.Div.1984). That result obtains even where litigation may eventually arise from the subject of the attorney's activities. *Ibid.*

█ The key issue regarding the applicability of the privilege in this case is the purpose of the various components of the investigation that defendant initiated into plaintiff's allegations of sexual harassment. If the purpose was to provide legal advice or to prepare for litigation, then the privilege applies. However, if the purpose was simply to enforce defendant's anti-harassment policy or to comply with its legal duty to investigate and to remedy the allegations, then the privilege does not apply.

Although, given the state of the record and the trial court's failure to conduct an *in camera* review of the documents at issue, we are unable to draw conclusions regarding specific documents, we do not perceive the investigation that defendant performed as being one that generally is covered by the privilege. Defendant allegedly initiated the investigation months before plaintiff brought suit against it. The timetable thus suggests that defendant began to investigate in order to comply with its internal policies and to fulfill its legal duty under *Lehmann.* Although any internal sexual-harassment complaint has the potential to balloon into a lawsuit, effective internal remediation is independently necessary and may prevent such an eventuality. Thus, it is unclear, and perhaps unlikely, that the attorneys involved in the investigation were truly or primarily acting in their legal capacities. We agree with the statement that

> [i]f all activities of a lawyer are to be classified as warranting the bar of discovery proceedings because of the attorney-client privilege, then it would be appropriate for clients to retain lawyers as investigators, custodians of records and the like, thereby turning the shield of the privilege into the sword of injustice.
>
> [*Metalsalts Corp. v. Weiss,* 76 *N.J.Super.* 291, 299, 184 *A.*2d 435 (Ch.Div.1962).]

A substantial number of sexual-harassment lawsuits raise the issue of the employer's response to the employee's internal complaint. If the attorney-client privilege were to apply broadly to any internal investigation of this type undertaken by an attorney, regardless of the pendency of litigation or the provision of legal advice, then all employers would commission attorneys as investigators, thus defeating the paramount public interest in eradicating discrimination as expressed in the LAD and as interpreted in *Lehmann* and *Dixon*. The Appellate Division expressed this point: "We deem it unlikely that ... *Lehmann*, having defined a cause of action against an employer based in part on the employer's response to a harassment complaint, [may be read] to permit an employer to immunize its response from inquiry by assigning a lawyer to investigate the complaint." 292 *N.J.Super.* at 50, 678 *A.*2d 279.

Moreover, the privilege, although important, is not sacrosanct. It "may be pierced upon a showing of need, relevance and materiality, and the fact that the information could not be secured from any less intrusive source." *Id.* at 52, 678 *A.*2d 279 (citing *In re Kozlov*, 79 *N.J.* 232, 243–44, 398 *A.*2d 882 (1979)). That principle is especially appropriate in this case, where the powerful public interest in eliminating discrimination and sexual harassment is present and where defendant's claim to the privilege is tenuous at best.

In any event, despite our doubts about the applicability of the privilege based solely on the status of those involved in the investigation as attorneys, we stress that the trial court must evaluate the individual documents at issue *in camera* to determine what role an attorney may have had in the creation of those particular documents. *See Wolosoff, supra,* 196 *N.J.Super.* at 563, 483 *A.*2d 821. The privilege very well may apply to portions of the investigation, thus requiring redaction or suppression if effective redaction is impossible.

█ If the trial court should determine that the privilege applies to particular aspects of the investigation—for example,

specific parts of the investigation after plaintiff filed this lawsuit—it then must determine whether defendant has waived the privilege by raising the investigation as an affirmative defense. A party may not abuse a privilege, including the attorney-client privilege, by asserting a claim or defense and then refusing to provide the information underlying that claim or defense based on the privilege. *Id.* at 565–67, 483 *A.*2d 821 (canvassing cases holding that waiver had occurred when party asserting privilege attempted to rely on privileged information as claim or defense); *cf.* *Brogan v. Passaic Daily News,* 22 *N.J.* 139, 151–52, 123 *A.*2d 473 (1956) (holding that newspaper had waived Shield Law privilege by relying on quality of informant in defense to libel action), *overruled in part by Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 194–96 & n. 8, 445 *A.*2d 376 (relying on statutory amendment to overrule *Brogan* waiver holding in Shield Law context), *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982). To allow such conduct would be truly inequitable. As the court stated in *Wolosoff, supra:*

> We note the inherent inequity in permitting [a party] to use the privilege as a sword rather than a shield. If permitted to do so, [a party] could divulge whatever information is favorable to its position and assert the privilege to preclude disclosure of the detrimental facts. The resulting half-truth that would be revealed might well be more disabling than a total distortion.
>
> [196 *N.J.Super.* at 567, 483 *A.*2d 821.]

*See also* Chodoff, *supra,* at 4 (noting the "well-reasoned arguments supporting the view that an employer may not assert as a defense to a sexual harassment lawsuit the fact that it conducted a prompt and thorough investigation and took reasonable remedial action ... without being required to disclose the substance of the investigation which forms the basis for that defense").

We note a recent federal decision that held, in circumstances strikingly similar to this case, that the defendant-employer had waived the attorney-client privilege regarding the contents of its investigation when it had attempted to use the results of the investigation to preclude liability under the LAD and Title VII. *Harding, supra,* 914 *F.Supp.* at 1091–97. The court stated that the defendant had

> attempted to utilize the results of [the attorney's] investigation ... as a defense to liability.... Consequently, [defendant] cannot now argue that its own process is shielded from discovery. Consistent with the doctrine of fairness, the plaintiffs must be permitted to probe the substance of [defendant's] alleged investigation to determine its sufficiency.
>
> [*Id.* at 1096.]

Defendant attempts to avoid application of waiver by reasserting that its affirmative defense solely concerns the final result of its investigation, namely, the sanctions that it imposed on Geberth and Stankowitz. However, we have rejected that argument because of the relevance of the entire investigatory process to plaintiff's attempt to overcome this affirmative defense. *Supra* at 537–39, 691 *A.*2d at 327–28.

Thus, it appears that defendant, by relying on the affirmative defense of having conducted an effective investigation into plaintiff's allegations, has waived the attorney-client privilege, assuming that the privilege applies to certain documents relating to the investigation. However, the trial court should conduct an *in camera* review of the materials at issue to determine if the privilege applies to specific documents, and, if so, whether those documents are so tenuously related to the affirmative defense that waiver is overcome despite the assertion of that defense.

### D.

Our analysis of the applicability of the work-product doctrine is similar to that of the attorney-client privilege. In order for the doctrine to apply, the materials must have been prepared in anticipation of litigation and not in the ordinary course of business, *Wylie, supra,* 195 *N.J.Super.* at 337, 478 *A.*2d 1273, and there must not be a "substantial need" for the materials. *R.* 4:10–2(c); *Jenkins v. Rainner,* 69 *N.J.* 50, 58, 350 *A.*2d 473 (1976). Moreover, the doctrine's protection must not have been waived. *In re Envtl. Ins. Declaratory Judgment Actions,* 259 *N.J.Super.* 308, 612 *A.*2d 1338 (App.Div.1992).

We believe that the work-product doctrine most likely does not protect the investigatory materials in this case. As we noted in

our discussion of the attorney-client privilege, the investigation allegedly began months before plaintiff commenced this litigation, although the conclusion of the investigation occurred after she had brought suit. In addition, plaintiff has demonstrated need for the documents relating to the investigation. The Appellate Division correctly noted that "[t]he information plaintiff may develop by deposing the same informants [who participated in the investigation] would not necessarily replicate what those informants told the Authority." 292 *N.J.Super.* at 52, 678 *A.2d* 279. Plaintiff needs to know exactly what defendant knew and when it knew it, information that she can obtain only by gaining access to the actual investigatory materials. Finally, defendant may have waived the protection of the doctrine by asserting the investigation as an affirmative defense.

Our doubts to one side, the trial court should conduct an *in camera* inspection of the documents to determine whether any are work-product and, if so, whether that consideration is outweighed by plaintiff's "substantial need," and, further, whether defendant's affirmative defense has waived the protection of the doctrine.

### E.

The Open Public Meetings Act ("the Act"), *N.J.S.A.* 10:4–6 to –21, guarantees the public notice of and access to the meetings, including executive sessions, of public bodies. The Legislative intent behind the Act is quite broad. The Act states that it is

> the public policy of this State to insure the right of its citizens to have adequate notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.
>
> [*N.J.S.A.* 10:4–7.]

Although the Act creates a strong presumption of access to the meetings of public bodies, *N.J.S.A.* 10:4–12a, it does enumerate certain circumstances under which the presumption is

rebutted. *N.J.S.A.* 10:4–12b. Those exceptions, though important, are qualified in two ways. First, courts strictly construe them against closure, given the stated legislative intent that such meetings are to be open to the public unless "the public interest would be *clearly* endangered or the personal privacy or guaranteed rights of individuals would be *clearly* in danger of unwarranted invasion." *N.J.S.A.* 10:4–7 (emphases added); *e.g., Accardi v. Mayor and Council of North Wildwood,* 145 *N.J.Super.* 532, 540–41, 543, 368 *A.*2d 416 (Law Div.1976) (noting Act's strong presumption against closure).

Second, a public body that meets in private generally must make the minutes of its meeting "promptly available to the public." *N.J.S.A.* 10:4–14. In *South Jersey Publishing Co. v. New Jersey Expressway Authority,* 124 *N.J.* 478, 591 *A.*2d 921 (1991), we interpreted this provision as requiring prompt availability even when the public body, in accordance with the Act, has met in closed session. *Id.* at 493–96, 591 *A.*2d 921. We stated that

> [t]he Legislature ... expressed its strong policy favoring adequate disclosure of all actions taken by public bodies, whether at public meetings or executive sessions.... In our view, it would be anomalous to interpret the Open Public Meetings Act, enacted by the Legislature to enhance the public's access to and understanding of the proceedings of governmental bodies, in a manner that foreclosed the public's right to obtain material and information vital to its ability to evaluate the wisdom of governmental action.
>
> [*Id.* at 493–94, 591 *A.*2d 921.]

In order to accommodate any privacy interest that may be implicated by disclosure of the minutes of a legitimate closed session, we determined that "the extent of disclosure may be modified appropriately ... provided the public interest is not subverted." *Id.* at 494, 591 *A.*2d 921 (citation omitted).

Although our discussion of the Act in *South Jersey Publishing* addressed one particular exception to the general requirement of conducting public meetings (the personnel exception), we perceive its reasoning to extend to all of the Act's exceptions. In other words, if a public body legitimately conducts a meeting in closed session under any of the exceptions enumerated in *N.J.S.A.*

10:4–12b, it nevertheless must make the minutes of that meeting "promptly available to the public" unless full disclosure would subvert the purpose of the particular exception. If disclosure would subvert the purpose of an exception, then the subversion must be balanced against the applicant's interest in disclosure. We believe that only the unusual case will justify total suppression of the minutes of a closed session; such a case would require great harm to the public interest underlying the exception from even minimal disclosure as well as a negligible interest in disclosure.

In the vast majority of cases in which full disclosure would have an adverse impact on the purpose of the particular exception, other methods of maintaining confidentiality can be achieved, such as redacting the specific information that would undermine the exception. We stress, however, that, given the Legislature's strongly stated intent to effectuate broad public participation in the affairs of governmental bodies, few cases will require even partial nondisclosure.

 In this case, defendant asserts three grounds for not disclosing the minutes of its executive session, namely, *N.J.S.A.* 10:4–12b(3) (relating to "unwarranted invasion[s] of individual privacy"), (7) (relating to pending litigation or matters otherwise covered by the attorney-client privilege), and (8) (relating to personnel matters). Regarding the personnel exception, we find the assertion to be without merit. In *South Jersey Publishing, supra,* we stated that

> [t]he purpose of the personnel exemption is to facilitate the process by which the public body makes personnel-type decisions, permitting the debate and deliberation to be conducted without public scrutiny or participation. But the exemption is designed to enable the public body to determine the appropriate action to be taken, not to withhold from the public either the public body's determination or the reasons on which its determination was based.
>
> [124 *N.J.* at 493–94, 591 *A.*2d 921.]

Although, in some exceptional cases, the minutes of a closed session regarding personnel decisions may be altered appropriately to protect confidentiality and in some very unusual cases, the minutes may be suppressed entirely, in this case, the exception

does not afford the minutes any protection because any confidentiality concerns are moot given the public announcement of Gebert's and Stankowitz's punishments and plaintiff's having filed suit.[2] Moreover, even if these confidentiality concerns were not moot, we believe that the powerful public policy, expressed in the LAD, of eradicating discrimination would require full disclosure under this exception.

The exception embodied in *N.J.S.A.* 10:4–12b(3), regarding invasion of privacy, is entirely inapplicable. By its terms, it applies only to governmental entities engaged in social-service and health-care programs and to individuals "admitted to or served by such institutions or programs." *Ibid.* The section clearly excludes defendant's operation of a highway.

 We view *N.J.S.A.* 10:4–12b(7), relating to pending litigation and material covered by the attorney-client privilege, as duplicative of the protection otherwise afforded by the attorney-client privilege and work-product doctrine. If a communication is covered by the privilege, then the public body legitimately may meet with its attorney in closed session. The minutes, part or all of which may constitute work-product, then may be appropriately suppressed or redacted.

As we already have stated, *supra* at 550–54, 691 *A.*2d at 333–36, the attorney-client privilege and work-product doctrine may apply to certain aspects of the investigation and the executive session, thus potentially requiring limited redaction and possibly (though not probably) calling for the withholding of specific documents. Suffice it to say that the Act provides no greater protection, and arguably provides less protection, than the privilege and doctrine in general. *See N.J.S.A.* 10:4–12b(7) (quali-

---

[2] Of course, we recognize that the confidentiality interests of various witnesses, apart from plaintiff, Gebert, and Stankowitz, are not moot. However, the Act is not the proper basis for protecting their confidentiality. Instead, the court should rely on its power to protect confidentiality under the balancing test that we have discussed previously. *See supra* at 540–44, 691 *A.*2d at 328–30.

 559

fying the privilege by the statement that it applies only "to the extent that confidentiality is required in order for the attorney to exercise his [or her] ethical duties as a lawyer").

We thus conclude that, in this case, the exceptions to the Act's general requirement of public meetings provide no additional protection to the materials at issue than that provided by the privileges and public policies that we already have discussed.

## IV

 Our discussion makes clear that we concur in the Appellate Division's vacation of the protective order. While we normally defer to a trial court's disposition of discovery matters, including the formulation of protective orders, unless the court has abused its discretion, *Hammock, supra,* 142 *N.J.* at 380, 662 *A.*2d 546; *Garden State Community Hosp. v. Watson,* 191 *N.J.Super.* 225, 228, 465 *A.*2d 1225 (App.Div.1982), *certif. denied,* 94 *N.J.* 518, 468 *A.*2d 176 (1983), deference is inappropriate if the court's determination in drafting its order is based on a mistaken understanding of the applicable law. *Alk Assoc. v. Multimodal Applied Systems, Inc.,* 276 *N.J.Super.* 310, 314–15, 647 *A.*2d 1359 (App.Div. 1994).

The remand in this case should be guided by what we stated in a related context:

The need for secrecy must be demonstrated with specificity as to *each document.* Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, are insufficient.... [T]he trial court ... must examine *each* document individually and make factual findings with regard to why [suppression is warranted].... *The need for secrecy should extend no further than necessary to protect the [demonstrated need for]* confidentiality.

[*Hammock, supra,* 142 *N.J.* at 381–82, 662 *A.*2d 546.]

The trial court, in readdressing discovery, should craft a new protective order that accurately balances the public interest in the eradication of discrimination and sexual harassment against the various confidentiality concerns that defendant has asserted. The court should begin with the presumption that all of the documents sought by plaintiff are discoverable, given their relevance to

plaintiff's claim that defendant did not effectively remediate the alleged harassment and to defendant's affirmative defense that it did. The court then should provide defendant with the opportunity to make particularized assertions of privilege or confidentiality regarding *specific* documents.

Accordingly, we affirm the judgment of the Appellate Division and remand the cause to the Law Division for proceedings not inconsistent with this opinion.

*For affirmance and remandment*—Justices HANDLER, O'HERN, GARIBALDI, STEIN and COLEMAN—5.

*Opposed—None.*