NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2913-15T2
              A-2929-15T2

CAPITAL HEALTH SYSTEM, INC.;
CENTRASTATE MEDICAL CENTER, INC.;
HOLY NAME MEDICAL CENTER, INC.;
THE COMMUNITY HOSPITAL GROUP,
INC., t/a JFK MEDICAL CENTER;
ST. LUKE'S WARREN HOSPITAL, INC.;
TRINITAS REGIONAL MEDICAL CENTER;
and THE VALLEY HOSPITAL, INC.,

> Plaintiffs-Respondents,

v.

HORIZON HEALTHCARE SERVICES, INC.,

> Defendant-Appellant.

───────────────────────────────

SAINT PETER'S UNIVERSITY
HOSPITAL,

> Plaintiff-Respondent,

v.

HORIZON HEALTHCARE SERVICES,
INC.,

> Defendant-Appellant.

───────────────────────────────

| APPROVED FOR PUBLICATION |
| :---: |
| June 23, 2016 |
| APPELLATE DIVISION |

> Argued June 8, 2016 — Decided June 23, 2016
>
> Before Judges Alvarez, Accurso and Haas.
>
> On appeal from Superior Court of New Jersey,
> Chancery Division, Bergen County, Docket No.

C-369-15 and Chancery Division, Middlesex County, Docket No. C-192-15.

Michael O. Kassak argued the cause for appellant Horizon Healthcare Services, Inc. (White and Williams, LLP, attorneys; Robert Wright, Andrew I. Hamelsky, Edward M. Koch, and Victor J. Zarrilli, on the briefs).

Michael K. Furey argued the cause for respondents in A-2913-15 (Day Pitney, LLP, attorneys; Mr. Furey and Dennis R. LaFiura, on the briefs).

Jeffrey J. Greenbaum and Dennis J. Drasco argued the cause for respondent St. Peter's University Hospital, Inc. in A-2929-15 (Sills Cummis & Gross, PC, and Lum Drasco & Positan, LLC, attorneys; Mr. Greenbaum, James M. Hirschhorn, Mr. Drasco and Elaine R. Cedrone, of counsel and on the briefs).

William F. Maderer argued the cause for intervenor Robert Wood Johnson University Hospital, Inc. in A-2929-15 (Saiber LLC, attorneys; Mr. Maderer and Vincent C. Cirilli, on the brief).

Edwin F. Chociey, Jr., argued the cause for intervenor Hackensack University Health Network and Inspira Health Network in A-2929-15 (Riker, Danzig, Scherer, Hyland & Perretti, LLP, attorneys; Glenn A. Clark and Mr. Chociey, on the brief).

The opinion of the court was delivered by

HAAS, J.A.D.

In these back-to-back cases, which we now consolidate for purposes of this opinion, we granted appellant Horizon Healthcare Services, Inc. (Horizon) leave to appeal from discovery orders requiring it to turn over six categories of

confidential and proprietary business documents to seven hospitals concerning its implementation of the OMNIA two-tiered provider network. For the reasons that follow, we reverse and remand for the entry of discovery orders which permit Horizon to redact these documents prior to disclosing them to the hospitals.

I.

Horizon currently provides health benefits to more than 3.8 million members, known as "subscribers." N.J.S.A. 17:48E-1(k). Horizon provides these benefits to its subscribers through a network of participating providers that, as authorized under N.J.S.A. 17:48E-10, have entered into "Network Hospital Agreements" (Network Agreements) with Horizon. The Network Agreements are standard contracts approved by the Department of Banking and Insurance (the Department), under which, in exchange for membership in the network, the hospital agrees to receive payment directly from Horizon on a set-fee basis. A schedule of the payment rates for covered hospital services is attached to the Network Agreement.

St. Peter's University Hospital (St. Peter's), Capital Health System, Inc. (Capital), Centrastate Medical Center (Centrastate), Holy Name Medical Center, Inc. (Holy Name), and The Community Hospital Group, Inc., t/a JFK Medical Center (JFK

Medical Center), entered into separate Network Agreements with Horizon. Section 2.7 of each of these Network Agreements provides:

> Other Networks. HORIZON reserves the right to establish other networks or subnetworks for certain or all Hospital Services for one or more HORIZON clients, based on quality, cost, effectiveness or other criteria, which may involve differential Copayments, Coinsurance, and Deductibles or other member incentives. HORIZON agrees to provide HOSPITAL with written notice at least sixty (60) days in advance of implementation. Notwithstanding, Horizon represents that Hospital shall participate in new networks or subnetworks, provided there are no specific objections by a client organization and hospital meets all criteria and standards established and evaluated by Horizon.

Section 2.8 of the Network Agreements states:

> New Products. HORIZON reserves the right to determine which new product(s) HOSPITAL shall participate in and does not guarantee HOSPITAL'S participation in new product(s) that HORIZON may introduce. Notwithstanding, Horizon represents that Hospital shall participate in new products, provided Hospital meets all criteria and standards established and evaluated by Horizon.

Trinitas Regional Medical Center (Trinitas) entered into a Network Agreement with Horizon that contained slightly different language in these two sections. The Trinitas Network Agreement states:

> 2.7 Other Networks. HORIZON reserves the right to establish other networks or

4                                                          A-2913-15T2

subnetworks for certain or all Hospital Services for one or more HORIZON clients, based on quality, cost, effectiveness or other criteria, which may involve differential Copayments, Coinsurance, and Deductibles or other member incentives. HORIZON agrees to provide HOSPITAL with written notice at least sixty (60) days in advance of implementation.

2.8 <u>New Products.</u> HORIZON reserves the right to determine which new product(s) HOSPITAL shall participate in and does not guarantee HOSPITAL'S participation in new product(s) that HORIZON may introduce.[1]

Each of the hospitals' Network Agreements also provides that: Horizon shall include the hospitals "in its published list of Network Hospitals and shall market and promote Subscription Agreements providing an incentive for Eligible Persons to use Network Hospitals instead of out-of-network hospitals" (Section 2.5.2); payment rates and negotiations are confidential (Section 7.3); and the Network Agreement is "non-exclusive" and does not prohibit the parties from entering into contracts with other hospitals (Section 7.5).

On June 25, 2015, Horizon submitted an application to the Department for approval of the OMNIA two-tiered provider

---

[1] The parties did not include a recent Network Agreement between Horizon and Valley Hospital, Inc. (Valley Hospital) in their appendices. However, we assume that the language of the Valley Hospital agreement is similar to the provisions quoted above. The parties did include information concerning St. Luke's Warren Hospital, Inc. However, that hospital voluntarily withdrew its appeal on May 2, 2016.

network.  Capital Health Sys., Inc. v. N.J. Dep't of Banking & Ins., ___ N.J. Super. ___ (App. Div. 2016) (slip op. at 10).  On September 10, 2015, Horizon publicly announced its launch of the OMNIA network, and the Department approved Horizon's application on September 18, 2015.  Id. at 12-13.

Through OMNIA, Horizon offers comprehensive health benefits to its subscribers at lower premiums than under other Horizon plans.  The OMNIA network has two tiers of in-network hospitals, physicians, and specialists under which a subscriber's cost-share (deductibles, co-insurance, co-payments) are lower if the member elects to use a Tier 1 provider.  Id. at 3.  The Tier 1 hospitals include seven "Alliance partners" (large hospital systems), all of which agreed to make financial concessions to Horizon regarding reimbursement, in return for sharing in the savings expected from the OMNIA product and benefiting from an anticipated increased volume of patients.

Horizon asserts that it assessed potential Alliance partners not as individual hospitals, but as "Organized Systems of Care."  In order to assist it in selecting the Alliance partners and Tier 1 hospital providers under the OMNIA plan, Horizon retained a consultant, McKinsey & Company (McKinsey).  McKinsey submitted a report to Horizon dated May 20, 2014, entitled "Assessing providers for value based partnerships:

Compendium." To identify and prioritize potential Alliance partners, Horizon evaluated the network hospitals using the following six broad criteria, which were developed in consultation with McKinsey: clinical quality; services; consumer preference data; value-based care capabilities; size; and willingness and ability to transition from a volume-based reimbursement model to a value-based care delivery system.

McKinsey then assisted Horizon in scoring the hospitals, and in comparing the scores within each geographic service area to determine which hospital in that area would be designated as an Alliance partner and Tier 1 hospital. In the report, McKinsey calculated a "Partnership score" for each of the network hospitals by applying a set of criteria (six categories) and metrics (nineteen items), ranked the hospitals pursuant to that criteria, and then on a series of graphs, compared their Partnership scores to their "Performance scores," or cost-effectiveness.

Horizon ultimately did not use the Performance scores in selecting Alliance partners because it determined that the Partnership scores were the best measure of projecting which hospitals would be most effective in transitioning to a value-based care delivery system. Thus, McKinsey identified hospitals, based on Partnership scores only, to be targeted for

Alliance partnership (Tier 1), non-partner Tier 1 hospitals, and Tier 2 hospitals. Horizon added non-partner Tier 1 providers to ensure geographic coverage, consistent with N.J.A.C. 11:24A-4.10 (network adequacy), "based on locations that were not already covered by OMNIA Health Alliance partners, breadth of service, and market preference[.]"

Under the OMNIA plan, Horizon selected: seven Alliance partners (Atlantic Health System, Barnabas Health, Hackensack University Health Network (Hackensack), Hunterdon Healthcare, Inspira Health Network (Inspira), Robert Wood Johnson University Hospital (RWJ), and the Summit Medical Group), which represent twenty-two Tier 1 hospitals; thirteen non-partner Tier 1 hospitals; and thirty-two Tier 2 hospitals, including plaintiffs St. Peter's, Capital, Centrastate, Holy Name, JFK Medical Center, Trinitas, and Valley Hospital.

Horizon claims it executed "Letters of Intent" (LOIs) with the Alliance partners after confirming their "commitment to pursue value-based care and willingness to offer unit costs that would enable Horizon . . . to offer attractive premium rates to [its] customers." The LOIs contain the framework for "a proposed strategic relationship" and include the rates that would apply to the Alliance partner's participation as a Tier 1

provider. Horizon then negotiated "Alliance Agreements" and attached rate agreements with the Tier 1 hospitals.

By letters dated September 10, 2015, Horizon informed St. Peter's, Capital, Centrastate, Holy Name, JFK Medical Center, Trinitas, and Valley Hospital of their status as Tier 2 providers in the OMNIA plan. Unlike its prior practice, however, Horizon did not disclose its standards for selection or give the hospitals the opportunity to apply for Tier 1 status as it did when it established its Advance Tiered Network, a prior tiered network plan. Horizon claims it chose not to proceed in such fashion because "it would have signaled to the market, including competitors, that [it] was undertaking a new competitive strategy."

Those seven Tier 2 designated hospitals then instituted these two separate lawsuits against Horizon.

A. The St. Peter's Litigation

In November 2015, St. Peter's filed a verified complaint against Horizon in Middlesex County alleging, in count one, that Horizon breached Sections 2.7 and 2.8 of the Network Agreement by: failing to provide it with sixty-days' advance notice of the OMNIA plan; failing to disclose the criteria and standards used in selecting the Tier 1 hospitals; failing to select it as a Tier 1 provider or provide it with an opportunity to demonstrate

that it satisfied the criteria for Tier 1 status; and establishing criteria that excluded it from Tier 1 status and favored RWJ.

Based on that alleged conduct, St Peter's asserted claims for breach of the implied covenant of good faith and fair dealing (count two) and tortious interference with prospective economic advantage (count three). St. Peter's also alleged defamation and trade libel (count eight) based on Horizon's advertising that Tier 1 providers render better quality of care.

St. Peter's also asserted claims for unfair competition and civil conspiracy (count four), breach of fiduciary duty as a "quasi-public entity" (count five), equitable estoppel (count six), and consumer fraud (count seven). However, the trial judge subsequently dismissed these counts of the complaint.

St. Peter's sought to: enjoin implementation of the OMNIA plan; compel Horizon to disclose the written standards and criteria it used to select the tiered providers; include it as a Tier 1 hospital; and provide it with an opportunity to obtain Tier 1 status. On November 9, 2015, the trial judge issued an order to show cause without temporary restraints and directed the parties to engage in "expedited" discovery.

On November 17, 2015, the trial judge issued a "Discovery Confidentiality Order and HIPAA Qualified Protective Order"

("confidentiality order"), as negotiated and agreed to by the parties, prohibiting the use of confidential information for any business, commercial, competitive or personal purpose, and limiting disclosure to counsel, parties, and outside experts who signed a confidentiality agreement.

In December 2015, St. Peter's moved for a preliminary injunction to compel Horizon to include it as a Tier 1 hospital. In opposition to the application, Horizon submitted the affidavits of Jonathan Stout, Horizon's Director of Strategic Partnership Support and Implementation, and Gina Basiakos, Director of Network Management. Stout claimed that including St. Peter's as a Tier 1 provider would "effectively threaten[] the entire OMNIA health plan." The judge denied St. Peter's application for a preliminary injunction.

In December 2015, St. Peter's also sought an order compelling Horizon to produce certain "key documents," including, among other things: the McKinsey report; the Alliance Agreements; the formulation of Tier 1 criteria; partnership and performance scores for all Tier 1 hospitals, including RWJ; St. Peter's partnership and performance scores; and communications between Horizon and Alliance partners. Horizon objected to production of the documents on the basis of

relevancy and argued the information should be protected as confidential and proprietary business information.

After oral argument on the motion, the judge issued an order on January 25, 2016, compelling Horizon to produce for his in camera review the McKinsey report and engagement letter, and the Alliance Agreement (including the agreed upon rates) between Horizon and RWJ. The judge also ordered Horizon to disclose whether any of the Alliance Agreements contained "geographical exclusivity" provisions, but reserved, pending that disclosure, St. Peter's request for the production of the other Alliance Agreements. Horizon produced the documents for the judge's in camera review.

After oral argument on January 27, 2016, the judge issued an order on January 29, 2016 granting St. Peter's request to compel Horizon to produce, subject to the confidentiality order: 1) the unredacted McKinsey report; 2) Tier 1 hospital scores; 3) RWJ's Alliance Agreement, including the rate agreement, LOI, and template, except that provisions listing specific rates were to be produced "for the eyes of St. Peter's counsel only"; 4) Alliance Agreements executed with other Alliance partners, subject to any application for a protective order by any third

party to an agreement;[2] 5) Board of Director's minutes; 6) written communications between Horizon and RWJ relating to exclusivity as a Tier 1 hospital and its invitation to become an Alliance member.

Horizon moved for reconsideration of the January 29, 2016 order and for a limited protective order allowing it to redact selected portions of the McKinsey report and the Alliance Agreement template. Horizon argued that the selected portions of the documents should not be disclosed because the information was not relevant to St. Peter's claims and because they contained confidential and proprietary information about Horizon's business and its arrangements with St. Peter's competitors.[3] In support of the motion, Horizon attached affidavits by Stout and Basiakos, who maintained that the documents sought contained protected confidential and proprietary information. On February 26, 2016, the judge denied Horizon's motion for reconsideration, but modified the confidentiality order to limit disclosure of the rate agreement to St. Peter's counsel and its experts.

---

[2] Before the trial court, no third parties moved for a protective order. However, we granted motions filed by Hackensack, Inspira, and RWJ to intervene in these appeals to contest the release of information pertaining to them.

[3] For the first time, Horizon also argued that the template of the Alliance Agreement and the rate agreement with RWJ, but not the McKinsey report, should be protected as trade secrets.

On February 29, 2016, the trial judge issued an order denying Horizon's motion for a stay pending interlocutory appeal. In the attached statement of reasons, the judge stated that the existing confidentiality order provided sufficient protection of Horizon's confidential and proprietary information.

The judge found that all aspects of the design and projected operation of the OMNIA plan, including the McKinsey report, were relevant in determining "whether Horizon's choice and application of criteria had a rational basis," and whether Horizon "acted in good faith towards providers." Moreover, with regard to the template of the Alliance Agreements, the judge stated that:

> Horizon argues that certain provisions of the Template Partnership Agreement should not be disclosed because they reveal "Horizon's long strategy for the OMNIA health plan," its "unique economic agreement with its partners," and its "pricing model." These provisions are relevant for precisely that reason. Horizon has argued that the presence of more than one Tier 1 hospital in a geographic market will interfere with the Alliance [p]artner's ability to manage population health, but it has never explained how or why. Horizon has put all these factors at issue when it claimed in its Stout Certification that the entire OMNIA network will fall if Saint Peter's is added to Tier 1. Saint Peter's is entitled to discover exactly what financial incentives an Alliance [p]artner receives, how they relate to the management of

14

population health through the avoidance of inpatient admissions, in what way those incentives depend on the Alliance [p]artner being the only Tier 1 hospital, and why Saint Peter's cannot be given the same incentives. Moreover, Horizon's long term strategy is relevant to its exercise of fiduciary duty towards providers and the healthcare system, particularly insofar as Horizon has considered and pursued the migration of patients to its preferred hospital systems at the expense of Tier 2 hospitals.

Addressing the agreements with Horizon's Alliance partners, the judge found that:

Saint Peter's requested all agreements with all Tier 1 alliance members to explore all incentives given to such members to manage population health to determine whether those incentives will be undercut if Saint Peter's is admitted to Tier 1 or is also permitted to manage population health in the same way. Horizon has put all these agreements in issue when it claimed the entire OMNIA network will collapse if Saint Peter's is admitted to Tier 1. Such agreements are also relevant to determine whether they contain geographic exclusivity provisions comparable to the terms of the Robert Wood Johnson agreement. Horizon has claimed geographic exclusivity is part of a quid pro quo, in which the Alliance [p]artner is given a local monopoly in return for concessions it makes to Horizon.

Finally, the judge found that the LOI was

presumably a precursor to the agreement or agreements yet to be entered into between Horizon and Robert Wood Johnson. For the reasons stated in connection with the Template Partnership Agreement, information relating to Horizon's payment model is also

15

relevant to Horizon's defense that having another Tier 1 hospital in an Alliance [p]artner's geographic market will interfere with the Alliance [p]artner's ability to manage population health. Information relating to Horizon's strategy long term objectives for OMNIA is relevant to both the good faith with which it dealt with Saint Peter's and Horizon's breach of its fiduciary duty to providers and the healthcare system generally.

Thus, the judge ordered Horizon to produce: the McKinsey report, the LOI, the template of the Alliance Agreements, the Alliance Agreements, and the RWJ rate agreement.

On March 22, 2016, we granted Horizon's emergent motion for leave to appeal from the trial court's discovery order, and for a stay pending appeal.[4] Thereafter, the judge dismissed St. Peter's claims for breach of fiduciary duty, consumer fraud, unfair competition, and equitable estoppel. However, the judge did not revisit the prior discovery orders, which had been based, in significant part, on the alleged relevancy of the requested documents to the dismissed claims.

---

[4] We also ordered Horizon to include the unredacted documents in its appendix for our in camera review and a second set of documents with the redactions it claims are necessary to protect its confidential and proprietary information. We entered a similar order in the Capital litigation discussed below.

B.    The Capital[5] Litigation

In December 2015, Capital filed a verified complaint against Horizon in Bergen County alleging, in count one, that Horizon breached Sections 2.7, 2.8, and 2.5.2 of the Network Agreements by: failing to provide the hospitals with sixty-days' advance notice of the OMNIA plan; failing to disclose the criteria and standards used in selecting the Tier 1 hospitals; failing to provide the hospitals with an opportunity to demonstrate that they satisfy the criteria for Tier 1 status; establishing criteria that were designed to favor the largest hospital systems; and marketing Tier 1 hospitals as providing better care at a lower cost than Tier 2 hospitals.

Capital also asserted claims for breach of the implied covenant of good faith and fair dealing (count two), promissory estoppel (count three), tortious interference with prospective economic advantage (count four), breach of fiduciary duty as a health services corporation (count five), and defamation (count six). Capital sought an injunction to compel Horizon to engage in negotiations with the hospitals about their tier status and to enjoin any marketing of OMNIA that suggested that Tier 1

_____

[5] For ease of reference, we will hereafter collectively refer to the remaining six hospitals, Capital, Centrastate, Holy Name, JFK Medical Center, Trinitas, and Valley Hospital, as "Capital."

hospitals provided better care at a lower cost than Tier 2 hospitals.

On December 14, 2015, the trial judge issued an order to show cause without temporary restraints, which contained a provision allowing expedited discovery and directed Horizon to produce within five days, "all consultant's reports used in developing and applying" the "criteria and standards" used in determining Alliance membership and Tier 1 status, and the Tier 1 hospital scores derived from applying those criteria.

Horizon moved for reconsideration. On December 17, 2015, a second judge issued an order denying the motion and compelling Horizon, upon execution of a protective order, to provide Capital with an explanation of the criteria and standards used in determining Alliance membership and Tier 1 status, including the production of consultant's reports and the Tier 1 hospital scores. The judge signed a "Discovery Confidentiality Order and HIPAA Qualified Protective Order" ("confidentiality order") as agreed to by the parties, prohibiting the use of confidential information for any business, commercial, competitive or personal purpose, and limiting disclosure to counsel, parties, and outside experts who signed a confidentiality agreement.

On January 13, 2016, the judge granted Capital's motion for discovery and, among other relief, ordered Horizon to submit an

unredacted copy of the McKinsey report to the court for an in camera review. Horizon supplied the unredacted McKinsey report to the court, together with a letter detailing which pages should be redacted because it alleged they contained information not relevant to Capital's claims and protected confidential and proprietary information.[6]

Following oral argument on February 8, 2016, the judge found that although the McKinsey report was "not 100 percent understandable by a layperson" and was "an imposing thing to digest," it was relevant to Capital's claims and thus subject to discovery. The judge also found that although the information "looks somewhat confidential and proprietary," it would be protected from disclosure by the confidentiality order. The judge issued an order on that same date directing Horizon to produce the McKinsey report to the hospitals (and a limited number of their consultants), subject to the confidentiality order and certain redactions, for the purpose of determining whether any other portions of the report could be redacted.

Horizon filed a motion seeking additional redactions to the McKinsey report and for a more expansive protective order. Capital filed a cross-motion to compel discovery.

---

[6] As in the St. Peter's litigation, Horizon did not allege that the McKinsey report constituted a trade secret.

In support of its motion, Horizon attached an affidavit by Basiakos, stating that the McKinsey report contained "confidential and proprietary information that should not be shared with the . . . hospitals." Basiakos asserted that if the McKinsey report was disclosed, the hospitals "would know specific unit cost structures of its direct competitors in the market and utilize this information to their advantage in negotiating rates with Horizon in the future."

Horizon identified specific pages of the McKinsey report that it argued should not be disclosed because the information was not relevant to Capital's claims and contained protected confidential and proprietary information. Specifically, Horizon sought to redact: the performance and partnership scores of hospitals outside each hospital's geographic service area (pages 9-12); the ranking information (pages 15, 17-20); financial projections (pages 23-29); information regarding out-of-state hospitals (pages 31-38); healthcare costs in certain regions (pages 41-54); analytical tools for evaluating future performance (Pages 77-78); and the appendix (page 79).

On March 8, 2016, the judge issued an order: 1) directing Horizon to produce the McKinsey report, subject to the existing confidentiality order, and allowing additional redactions of page 16, portions of pages 41-45, pages 52-54, and the screen

20                                                              A-2913-15T2

shots on page 77; 2) limiting the distribution of the redacted McKinsey report to each hospital's counsel, each hospital's CFO and CEO, one "technical person" at each of the hospitals who was not involved in contract, rate, or price negotiations with Horizon, and each hospital's outside consultants; and 3) directing Horizon to produce the reports referenced on pages 77 and 78 of the McKinsey report limited to "attorney's eyes" only. On March 22, 2016, we granted Horizon's emergent motion for leave to appeal from the March 8, 2016 order and for a stay pending appeal.

Meanwhile, on March 15, 2016, Capital submitted a letter to the trial judge seeking to compel Horizon to produce, among other things, the Alliance Agreements and any communications between Horizon and the Alliance partners regarding the OMNIA plan. By letter dated March 21, 2016, Horizon opposed production of the documents based on relevancy, and because the documents contained confidential, proprietary and trade secret information, but did not request that the judge conduct an in camera review of the Agreements.

During oral argument, the judge, who had not reviewed the Alliance Agreements, nevertheless found the Agreements were relevant to Capital's claims, and should be produced subject to a redaction of the financial information and the existing

21                                    A-2913-15T2

confidentiality order. On March 24, 2016, the judge entered an order directing Horizon to produce: 1) copies of the Alliance Agreements, subject to the redaction of financial data; and 2) all communications between Horizon and Alliance members regarding their participation in OMNIA.

We granted Horizon's motion for leave to appeal from the March 24, 2016 order and for a limited stay, and joined this appeal with Horizon's prior appeal from the March 8, 2016 order.

## II.

On appeal, Horizon contends the judges misapplied their discretion by ordering it to produce the McKinsey report, the Alliance Agreements, the template of the Alliance Agreements, the LOI between Horizon and RWJ, RWJ's rate agreement, and Horizon's communications with its Alliance partners.[7] Horizon asserts the information it seeks to redact in these documents is not relevant to the hospitals' claims and is protected

---

[7] At oral argument, Capital's counsel stated that the hospitals now wished to modify their request for communications between Horizon and its Alliance partners. We interpret this statement as a withdrawal of Capital's prior request for this information and direct it to submit its new request to the trial judge for review in the first instance. Therefore, we reverse the portion of the judge's order that required Horizon to provide Capital with unredacted copies of these communications. We also note that the judge did not review any of the requested documentation to determine either its relevancy or confidentiality prior to ordering its release. Thus, even had Capital not apprised us that it wished to formulate a new discovery request, we would be constrained to reverse this portion of the order.

confidential and proprietary business information that it should not be required to disclose. We agree.

The principles governing our review of the trial judges' decisions are well settled. "[W]e apply an abuse of discretion standard to decisions made by [the] trial courts relating to matters of discovery." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011).

At the outset, it is important to note, as our late colleague Judge Sylvia Pressler observed over fifteen years ago, that appellate courts begin their review of a judge's decision on a discovery matter with an appreciation of "the broad scope of permissible discovery." K.S. v. ABC Prof'l Corp., 330 N.J. Super. 288, 291 (App Div.), motion for leave to appeal denied, 174 N.J. 411 (2000). Thus, "[w]e understand that discovery is not limited to obtaining admissible information but, rather, includes the obtaining of any information, not otherwise privileged, that 'appears reasonably calculated to lead to the discovery of admissible evidence[.]'" Ibid. (quoting R. 4:10-2(a)).

That having been said, it is equally well established that "the scope of discovery is not infinite." Ibid. Rather, it is limited to information, "not privileged, which is relevant to

the subject matter involved in the pending action[.]"  R. 4:10-2(a) (emphasis added).

In determining whether documents are discoverable, courts initially consider their relevance to the issues raised in the litigation.  Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997).  Relevant evidence is defined under N.J.R.E. 401 as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." However, in the context of pretrial discovery proceedings in a civil case, the concept of relevance is broader than under N.J.R.E. 401; "the test is whether the [information] is useful, or if it relates to issues in the case or to the credibility of a party."  Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 401 (2016).

In applying the rule in this case, it is important to note that, at their core, the hospitals' claims are based on, and inextricably tied to, the language of their respective Network Agreements with Horizon.[8]  The hospitals contend that Horizon breached their Network Agreements by, among other things, failing to: give them the opportunity to participate in the OMNIA network as Tier 1 providers; disclose the criteria Horizon used to select hospitals for each tier; and provide them with

_____

[8] The pertinent language was quoted earlier in this opinion.

sixty days' advance notice of the implementation of the OMNIA program. The hospitals also assert that Horizon wrongfully favored their competitors in its development of the criteria.

Although we are not called upon in this appeal to rule on the merits of the hospitals' claims, we cannot avoid analyzing those claims in assessing the relevancy of the information St. Peter's and Capital seek in discovery. Accordingly, we turn to the law governing the interpretation of contracts and the language of the Network Agreements.

Courts usually enforce contracts as written. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960). The interpretation of a contract, and the determination of whether a party's conduct constituted a breach thereof, is usually a question of law. See Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 190 (App. Div.), certif. denied, 196 N.J. 85 (2008).

Here, Sections 2.7 and 2.8 of the Agreements clearly state that Horizon is permitted to establish new networks, in which the hospitals may participate if they meet "all criteria and standards established and evaluated by Horizon." Thus, on its face, the plain language of the Agreements does not appear to support the hospitals' claims that Horizon was required to place them in Tier 1 of the new program, or give them the opportunity

to apply for inclusion in that specific tier. As required by the Agreements, all of the hospitals involved in this litigation participate in the OMNIA network, albeit as Tier 2 providers.[9]

The non-exclusivity provisions of Section 7.5 of the Agreements also gave Horizon the opportunity to enter into new contracts with other hospitals, including competitors of St. Peter's and Capital. Thus, the Agreements do not require Horizon to treat all hospitals the same in terms of future products.

It is also undisputed that Horizon notified the hospitals on September 10, 2015 of the new OMNIA product and their tier placement more than sixty days before the OMNIA program's effective date. Finally, Section 7.3 of the Agreements states that the agreements, payment rates and negotiations are confidential, which belies the hospitals' current claim that they should be entitled to information concerning their competitors, including the rates those competitors will charge under OMNIA.[10]

---

[9] We recently held that no statute or regulation required Horizon "to allow [hospitals] to apply for Tier 1 status." Capital Health, supra, slip op. at 26.

[10] In Capital Health, supra, we also ruled that "[t]here is . . . no requirement in the [governing statutes] that a carrier publicly disclose the criteria it used to evaluate the hospitals
(continued)

Therefore, based on the plain language of the Agreements, the hospitals' claims appear to rest on the slenderest of reeds. And, because the hospitals' claims will rise or fall on the content of the Agreements themselves, it is difficult to discern the relevancy of the far-ranging discovery they now seek.

However, St. Peter's and Capital contend that the language of their Network Agreements is ambiguous rather than clear and, therefore, they are entitled to seek extrinsic evidence in discovery to address these ambiguities, and to determine whether Horizon breached the agreements. See Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 268-70 (2006) (discussing role of extrinsic evidence in contract interpretation). Horizon disputes that the language used in the Network Agreements is ambiguous or that the documents sought are relevant to ascertaining its meaning.

We are not called upon in these appeals to rule upon the question of whether the Network Agreements are ambiguous, or if a breach occurred. However, as noted above, we must consider whether the information the hospitals seek in discovery is relevant to their claims. The relevancy of this material, however, is only part of the equation. It is well settled that

_____

(continued)
for inclusion in, or exclusion from, a particular tier" of the OMNIA program. Id. at 27.

"[a]lthough relevance creates a presumption of discoverability, that presumption can be overcome by demonstrating the applicability of an evidentiary privilege."  Payton, supra, 148 N.J. at 539.  Horizon argues that even if relevant, the documents the hospitals seek contain privileged trade secrets and confidential business information not subject to discovery.

Privileges reflect "a societal judgment that the need for confidentiality outweighs the need for disclosure."  Ibid. Trade secrets are privileged under N.J.R.E. 514 (N.J.S.A. 2A:84A-26), which provides that "[t]he owner of a trade secret has a privilege . . . to refuse to disclose the secret and to prevent other persons from disclosing it if the judge finds that the allowance of the privilege will not tend to conceal fraud or otherwise work injustice."  Confidential and proprietary information, while not privileged, is also entitled to protection from disclosure, but not to the same level as trade secret information.  Hammock v. Hoffmann-LaRoche, Inc., 142 N.J. 356, 383 (1995).  Further, the trade secret

> privilege is qualified in the sense that disclosure will be compelled when the information is needed to try some issue in the proceeding.  This is a balancing test. Where the need is not strong, disclosure will not be compelled.  Where disclosure is required, it must be balanced by a protective order to prevent loss of the property interest.

> [Biunno, _supra_, <u>Current N.J. Rules of Evidence</u> at comment 3 on <u>N.J.R.E.</u> 514 (emphasis added).]

Applying these principles, and having reviewed the contested documents, the pleadings, and the arguments of the parties, we conclude that the information sought by St. Peter's and Capital is not relevant to the issues of contract interpretation that dominate this litigation,[11] and that, even if relevant, the hospitals' asserted need for this discovery is outweighed by Horizon's greater need to preserve the confidentiality of its proprietary business information. Therefore, we conclude the trial judges misapplied their discretion when they ordered Horizon to present this information in unredacted form. We explain our conclusions on a document-by-document basis and address specific redactions in each document to be produced.

A.    <u>The McKinsey Report</u>

Horizon argues that the trial judges erred in ordering the disclosure of the McKinsey report, as redacted by the trial

---

[11] We recognize, of course, that the hospitals raised claims other than breach of contract in their respective complaints, and we have also considered the relevance of the discovery they seek to those claims.  We highlight the breach of contract and related claims, such as breach of the implied covenant of good faith and fair dealing, because we determine that the terms of the hospitals' Network Agreements control their rights and Horizon's obligations in these matters.

judge in the Capital litigation, and in unredacted form in the St. Peter's litigation. Based upon Basiakos's and Stout's affidavits, Horizon asserts that the McKinsey report contains proprietary, confidential business information regarding assumptions and projections used in creating OMNIA and future products; information about hospitals including confidential cost, price and rate information; rankings of the hospitals pursuant to proprietary criteria developed by McKinsey; scores of the hospitals developed by McKinsey; metrics and data supporting McKinsey's strategy and assumptions; estimated healthcare costs; and financial projections for OMNIA and other products.[12]

Based upon our in camera review, we agree with Horizon that this information is clearly subject to protection.[13] As

---

[12] For the first time on appeal, Horizon argues that information in the McKinsey report also constitutes privileged trade secrets. However, we usually decline to consider issues not presented to the trial court, and we follow that general rule here. State v. Robinson, 200 N.J. 1, 19 (2009) ("The jurisdiction of appellate courts . . . is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves.").

[13] Horizon did not, as argued by St. Peter's, waive any privilege or right to secrecy by disclosing an unredacted version of the McKinsey report in the Capital case because the disclosure in that case was subject to a confidentiality order that contained express obligations to keep the information confidential. See Biunno, supra, Current N.J. Rules of Evidence at comment 2 on N.J.R.E. 514.

explained in the affidavits, the report contains highly confidential, "competitively sensitive," and proprietary information that could give St. Peter's and Capital a competitive edge in negotiating future rates with Horizon. <u>See Lamorte Burns & Co. v. Walters</u>, 167 <u>N.J.</u> 285, 299 (2001) ("information need not rise to the level of trade secret to be protected"); <u>Platinum Mgmt., Inc. v. Dahms</u>, 285 <u>N.J. Super.</u> 274, 295-96 (Ch. Div. 1995) (competitive pricing strategies, marketing plans, product strategies and customer lists constituted protected confidential information). In fact, in managed care plans "[t]he fee schedule provided to the health care provider by the carrier is <u>proprietary</u> and shall be <u>confidential</u>." <u>N.J.S.A.</u> 26:2S-9.2 (emphasis added).

Contrary to the hospitals' contentions, they are not entitled to disclosure of this protected confidential and proprietary information "merely on the strength of having filed a complaint." <u>Dixon v. Rutgers, The State Univ. of N.J.</u>, 110 <u>N.J.</u> 432, 454 (1988) (quoting <u>Zaustinsky v. Univ. of Cal.</u>, 96 <u>F.R.D.</u> 622, 625 (1983)). Instead, we conduct a balancing test to determine whether the hospitals' asserted need for the confidential information as relevant and necessary to prove their cause of action outweighs Horizon's claim of injury resulting from disclosure. <u>See</u> <u>In re Liquidation of Integrity</u>

Ins. Co., 165 N.J. 75, 94 (2000); Piniero v. N.J. Div. of State Police, 404 N.J. Super. 194, 204 (App. Div. 2008); Trump's Castle Assocs. v. Tallone, 275 N.J. Super. 159, 164 (App. Div. 1994); see also Dendrite Int'l, Inc. v. Doe No. 3, 342 N.J. Super. 134, 141-42 (App. Div. 2001) (in determining whether to compel the identity of an anonymous Internet poster, courts balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case).

Here, the trial judge's decision compelling disclosure of the unredacted McKinsey report in the St. Peter's case was based, in part, on the fact that the information was relevant to prove St. Peter's claims for unfair competition and civil conspiracy, breach of fiduciary duty, equitable estoppel, and consumer fraud; claims that were all subsequently dismissed. At present, the remaining claims (except defamation) relate to the breach of the Network Agreement, that is, the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with prospective economic advantage.

While at this point, Capital's similar claims are still extant in its case, we have already discussed how, as in the St. Peter's case, the resolution of those allegations is largely dependent upon the provisions of the hospitals' Network

Agreements with Horizon. Even if Capital's non-contract assertions are considered, it is difficult to discern the relevancy of the disputed portions of the McKinsey report to those claims. Capital contends that the factual basis for its implied covenant and promissory estoppel claims is Horizon's conduct in extracting lower rates from them in exchange for promises of increased volume, while at the same time "secretly planning to launch OMNIA, which would decimate the volume." The factual basis for the tort claims (which, except for the defamation claim were already dismissed by the judge in the St. Peter's case) is based in part on Horizon's alleged duty, as a "quasi-public entity" to act in a manner that advances the public good. We are not aware of any case law that supports that proposition.

On the other side of the equation, the portions of the McKinsey report that Horizon seeks to redact include scoring for hospitals not in St. Peter's and Capital's geographic regions, lists of hospitals considered as alternatives, the specific numerical estimates of volume growth, shared savings and cost reductions, infrastructure investment, and a financial analysis of the proposed Alliance partners. All of this information would give St. Peter's and Capital a tremendous and

33                                                          A-2913-15T2

unprecedented advantage over their competitors in future negotiations with Horizon and other insurance carriers.

Horizon also seeks to redact information in the report concerning hospitals located in New York and Pennsylvania. This unrelated information, together with Horizon's strategy, assumptions, and projections for developing the OMNIA program, is not relevant to the hospitals' contract claims and, at best, only marginally relevant to Capital's other claims, which have already been dismissed in the St. Peter's litigation.

Because the disputed information in the McKinsey report is so clearly confidential and, just as clearly, of little or no relevance to the hospitals' claims against Horizon, we conclude the trial judges should have redacted the McKinsey report in accordance with Horizon's motions. Thus, we reverse their orders on this point, and direct the trial courts to enter orders permitting Horizon to redact the following information before producing the McKinsey report:

    1.  Pages 9-12 (hospital scoring);

    2.  Pages 13-14 (physician scoring);

    3.  Pages 16-22 (other regions);

    4.  Pages 23-28 (financial projections);

    5.  Page 29 (shared savings);

    6.  Pages 31-38 (potential value from NY and PA hospitals);

7.   Pages 41-45 (numbers only);

8.   Pages 47-54 (numbers only);

9.   Pages 57-58 (financial information);

10.  Pages 77-78 (metrics); and

11.  Page 79 (items 6 to 9 only).[14]

B.   Alliance Agreements

In the Capital case, the judge ordered Horizon to provide the hospitals with copies of all seven Alliance Agreements, with the financial data redacted.  The judge did not review these Agreements before he ordered Horizon to produce them.  In the St. Peter's case, the judge ordered Horizon to give St. Peter's copies of Hackensack's and Inspira's Alliance Agreements, with no redactions.  Neither of these hospitals are in St. Peter's geographic coverage area.

Horizon and the two interveners, Hackensack and Inspira, assert the judges mistakenly exercised their discretion in ordering the disclosure of this information.  We agree.

---

[14] These redactions are included in the copy of the redacted McKinsey report that Horizon included in its confidential appendix in the St. Peter's appeal, beginning at page Dca273. Even with these redactions, St. Peter's and Capital will receive significant information from the McKinsey report concerning the OMNIA program, including the criteria used "to assess ability to partner" as set forth on page eight of the report.

We have reviewed the unredacted Alliance Agreements provided by Horizon for RWJ, Hackensack, Hunterdon, and the Summit Medical Group.[15]  Based upon that review, we conclude that there is nothing in the Agreements that is relevant to the hospitals' contract claims.  The Agreements do not relate to the formation of OMNIA or the process of selecting Tier 1 providers. In fact, the Agreements were created after the selection of the Tier 1 partners, as a result of negotiations between Horizon and each individual Alliance partner, and contain information specific to each hospital.

Any possible relevancy to the hospitals' other claims is more than outweighed by the need to preserve the confidentiality of the proprietary information contained in the Agreements. This hospital-specific information is also protected by the clear confidentiality provisions contained in each of the Agreements.  Moreover, Horizon has agreed to provide the hospitals with a copy of the redacted template for the Agreements.  Therefore, the hospitals will be aware of most of the subjects covered by the Agreements, and of many of the

---

[15] Horizon did not provide the three other Alliance Agreements it was ordered to produce.  We assume that is because they contain information similar to that contained in the Agreements that are included in the record.  If that is incorrect, production of those documents are to be governed by further order of the trial courts as guided by this opinion.

A-2913-15T2

details concerning them.  Horizon has also agreed to provide the hospitals with the exclusivity provisions in these Agreements to address their claim that there should be no geographic limitations to the number of Alliance partners or Tier 1 providers in each area of the State.

Accordingly, we reverse and remand the trial courts' orders concerning the Alliance Agreements, and direct that orders be entered protecting them from disclosure with the exception of the exclusivity provisions contained therein.

C.   Template of the Alliance Agreement

In the St. Peter's case, the judge ordered that Horizon give the hospital an unredacted copy of the template of the Alliance Agreement.  However, our review of the template confirms Horizon's contention that certain sections of this document contain non-relevant, but highly confidential or proprietary business information.  This information includes a description of Horizon's responsibilities regarding utilization management, and development of new products (Sections 4.1(a), 4.1(b), and 4.1(e)); a description of "hospital system restricted activities" (Section 4.6(a)(1)); information concerning patient use data (Section 8.1); information regarding the financial aspects of the Alliance partnership (Schedule 3); and the Quality Metrics attachment.

The information in these sections of the template is not relevant to whether Horizon breached its agreement with St. Peter's because it does not relate to either the formation of OMNIA or the selection of Tier 1 providers. As was the case with the Alliance Agreements, the template had not yet been created when Horizon selected its Tier 1 partners. Because there is no legally cognizable need for disclosure of the confidential and proprietary information contained in these parts of the template, the judge should not have ordered its disclosure. And, even if the information could be deemed relevant in some limited fashion, the need for confidentiality of information that could give St. Peter's an unfair competitive edge over its competitors clearly outweighs any presumption of access.

Finally on this point, we disagree with the trial judge's determination that Horizon opened the door to disclosure of all of the information in the unredacted template when it claimed including St. Peter's as a Tier 1 provider in the OMNIA plan, which provides for exclusivity in a geographic region, would effectively threaten the entire plan. First, the fact that Horizon cannot add another Tier 1 hospital to a specific geographic area is not relevant to whether Horizon breached the Network Agreement, nor is it a defense to a claim for breach of

contract.  Instead, as Horizon argues, it is an equitable defense to the claim for specific performance St. Peter's seeks should it establish its breach of contract claim.

Further, to the extent the exclusivity provisions are relevant, Horizon provided St. Peter's with that information in Section 4.6(b) of the template, which provides that Horizon agrees to limit the addition of any Tier 1 hospitals within a geographic area.  Additionally, as discussed above, Horizon has agreed to provide St. Peter's with the specific exclusivity provisions of the executed Alliance Agreements and it should provide this same information to Capital if requested.

Therefore, we reverse the trial judge's order concerning the template of the Alliance Agreement.  We remand to the trial court for the entry of an order permitting Horizon to redact Sections 4.1(a), (b), and (e); Section 4.6(a)(1); Section 8.1; Schedule 3, and the Quality Metrics attachment from this document.

D.  <u>LOI Between Horizon and RWJ</u>

After reviewing the LOI between Horizon and RWJ, we believe that the trial judge incorrectly applied his discretion by ordering the release of the entire LOI to St. Peter's.  Certain sections of the LOI obviously contain protected proprietary and confidential information.  Specifically, Section 1 contains

information concerning Horizon's long-term strategy; Section 2 contains proprietary information regarding Horizon's product portfolio; Section 8 contains information regarding future products; Section 9 contains proprietary and confidential economic information regarding Horizon's payment model; and Section 10 contains proprietary information regarding Horizon's private financial information. This information is not relevant to St. Peter's claim that Horizon breached its contract regarding inclusion in the OMNIA network. Again, this document was not even in existence at the time Tier 1 selections were made.

Therefore, we reverse and remand for the entry of an order permitting Horizon to redact Sections 1, 2, 8, 9, and 10 from the LOI before providing it to St. Peter's.

E.  RWJ's Rate Agreement

Finally, we agree with Horizon and RWJ that the judge misapplied his discretion in requiring Horizon to give St. Peter's an unredacted copy of RWJ's rate agreement with Horizon. As RWJ correctly points out, the disclosure of this confidential and proprietary information to its direct competitor could likely cause RWJ severe and irreparable harm. The rate agreement sets forth the amounts RWJ agreed to accept as payment

for healthcare services and the manner in which it will be reimbursed.

RWJ contends that "[t]he amounts Horizon pays for services and the basis upon which those payments are made are the product of extensive research, analysis, and negotiation with Horizon by RWJ, at considerable expense." As a result, RWJ treats this information as a trade secret and expects Horizon to do the same. See N.J.S.A. 26:2S-9.2(a) ("fee schedule provided to the health care provider by the carrier is proprietary and shall be confidential"). Clearly, no other hospital has access to RWJ's rate schedules because disclosure of this information could likely harm RWJ's dealings with other insurance companies and place it at a competitive disadvantage.

The terms of RWJ's negotiated rate agreement with Horizon are not relevant to whether Horizon breached its contract with St. Peter's because it does not relate to either the formation of OMNIA or the selection of Tier 1 providers. Thus, there was no basis for disclosure of this highly confidential and proprietary information. Moreover, even if the information was somehow relevant, the need for confidentiality of information that could clearly give St. Peter's an unfair competitive edge over its direct competitor in its geographic region outweighs any presumption of access.

41

Accordingly, we reverse the trial judge's determination and remand for the entry of an order permitting Horizon to redact the specific rate information contained in the RWJ rate agreement.[16]

Reversed and remanded for entry of amended discovery orders in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[16] Because we have ordered that all the confidential and proprietary business information described above should be redacted, we need not address Horizon's alternate claim that a more stringent protective order is needed.