**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2963-22

DANIELA BURGA,

     Plaintiff-Appellant,

v.

UNIFIRST CORP., VICTOR
GOMEZ, JOHN WALKER, REIS
LAMONTAGNE, JUSTIN EXLINE,
and VICTORIA PANARESE,

     Defendants-Respondents.

_____

Argued September 11, 2024 – Decided August 18, 2025

Before Judges Mayer, DeAlmeida, and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1567-20.

Mark R. Scirocco argued the cause for appellant (Scirocco Law, PC, attorneys; Robert A. Scirocco, of counsel; Mark R. Scirocco and Stephen T. Scirocco, on the briefs).

Thomas J. Rattay argued the cause for respondents UniFirst Corporation, John Walker, Reis Lamontagne, Justin Exline, and Victoria Panarese (Ogletree,

Deakins, Nash, Smoak & Stewart, PC, attorneys; Thomas J. Rattay and Justine L. Abrams, on the brief).

James M. McCreedy argued the cause for respondent Victor Gomez (Wiley, Malehorn, Sirota & Raynes, attorneys; James M. McCreedy, of counsel and on the brief; Carolyn C. Duff, on the brief).

PER CURIAM

Plaintiff Daniela Burga appeals from two Law Division orders granting summary judgment to defendants and dismissing her amended complaint alleging hostile work environment and constructive discharge claims pursuant to the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. We reverse.

I.

The following facts were alleged in the amended complaint or are derived from the summary judgment record, as viewed in the light most favorable to plaintiff. Defendant UniFirst Corporation (UniFirst) was a workwear service company that provided uniforms, protective clothing, and corporate apparel to businesses. Defendant John Walker was the general manager of UniFirst's Whippany office. Defendant Justin Exline was the senior manager of employee relations and human resources (HR) compliance at UniFirst's corporate headquarters in Boston. Exline's responsibilities included managing UniFirst's employee relations team and HR compliance team. Defendant Victoria Panarese

was an HR manager for UniFirst, whose responsibilities included investigating employee complaints. Defendant Reis LaMontagne was a regional vice president of UniFirst. We refer to these defendants collectively as the UniFirst Defendants.

UniFirst had a written anti-harassment policy which stated "[i]t is the Company's policy to provide and maintain a workplace that is free of sexual harassment." The policy defined harassment as "any verbal or physical conduct designed to threaten, intimidate, or coerce a Team Partner [or] co-worker," including verbal and non-verbal harassment. The policy included a section specific to sexual harassment, and identified examples of sexual harassment, including "[u]nwelcome sexual advances, flirtations, advances, leering," and "obscene or vulgar gestures."

Defendant Victor Gomez worked at UniFirst from 2011 to 2022. In 2019, Gomez was a route service manager (RSM). As RSM, Gomez's functions related to customer service, including managing the service department and accounts receivable, which collected payments from customers. While employed at UniFirst, Gomez annually completed the company's online anti-harassment training.

A-2963-22

Gomez was the subject of a 2019 internal sexual harassment complaint by a female employee, N.R.[1] In March 2019, N.R. reported Gomez held closed-door meetings with her, made sexually inappropriate statements, and took photographs of her without her consent. As a result of N.R.'s complaint, UniFirst conducted an investigation and found Gomez took "pictures of [N.R.], ask[ed] if [she] was single, [was] flirtatious, call[ed] [N.R.'s] cell[phone] after hours, said he couldn't keep [his] hands off her[, and put his] hands on her back." The investigation also confirmed Gomez had closed-door meetings with N.R.

Gomez was suspended without pay for three days during UniFirst's investigation. After the investigation, UniFirst issued a letter to Gomez, stating his behavior was "concerning," and the company would not tolerate his "lack of judgment." The letter informed Gomez:

> [Y]our repeated calls and texts to [N.R. were] unnecessary and will not be permitted going forward. You are not [N.R.'s] direct manager, so there is no reason for you to be contacting her via phone calls and texts. Also, your decision to have closed[-]door meetings with [N.R.] had created a perception of inappropriateness. . . . Going forward, you will not be permitted to have direct contact with [N.R.].

---

[1] We use initials to protect N.R.'s privacy.

On March 25, 2019, plaintiff began working at UniFirst as a customer service representative (CSR).  Her role as a CSR was to "[u]tilize[] customer service systems to build lasting relationships and ensure the highest levels of customer satisfaction."  Plaintiff also was tasked with facilitating payment collections from customers in the accounts receivable department.  To fulfill her responsibilities, plaintiff had to develop strong relationships with the customers assigned to her.

Plaintiff was assigned routes which were composed of individual customers.  Each route was managed by a specific RSM, who was responsible for supervising the CSRs' accounts receivable functions.  To this end, there were mandatory weekly meetings between all RSMs and CSRs at the Whippany office.  When plaintiff started at UniFirst, she was assigned six routes, four of which were managed by Gomez.

Plaintiff was a native Peruvian who immigrated to the United States as a teenager and spoke fluent Spanish.  Among the routes to which she was assigned, many customers also spoke Spanish and plaintiff communicated with them exclusively in Spanish.  Over time, plaintiff developed good customer relationships with those assigned to her routes, which facilitated her ability to collect payments on time.

A-2963-22

As the RSM in charge of four of plaintiff's routes, Gomez oversaw and directed plaintiff's work. He was in regular contact with plaintiff, often in one-on-one meetings. In those meetings, Gomez often called plaintiff to his office and closed the office door. He also frequently communicated with plaintiff by cellphone and text messages.

On several occasions, Gomez praised plaintiff for her customer service work, including her effectiveness in collecting payments from customers. In January 2020, Gomez informed plaintiff that, due to his status as a manager, he could advocate on her behalf during her annual review. He told plaintiff he could help get her a raise because he had a good relationship with Walker.

In December 2019, Gomez told plaintiff how attractive she was and asked to take her photograph. Over the next several weeks, Gomez continued to make similar comments and requests. Plaintiff refused every of Gomez's requests to take her photograph. Typically, Gomez made the flirtatious comments during one-on-one meetings in his office with the door closed. From December 2019 to February 2020, Gomez took numerous photographs of plaintiff during work, an action unrelated to legitimate employment objectives.

During that time, plaintiff was aware of Gomez's history of sexual harassment of N.R. She testified "the whole office" knew about Gomez's prior

inappropriate conduct and "everybody was talking about it." Plaintiff also knew that because of N.R.'s complaint, Gomez "was gone for three days," and N.R. ultimately left UniFirst because of Gomez.

In early February 2020, plaintiff attended a mandatory weekly group meeting that included Gomez. Two other CSRs, Crystal Marotta and Giuseppe Pistoia, and the office administrator, Christina Semar, were present. During the meeting, Gomez made an obscene gesture while looking directly at plaintiff. He placed two fingers around his mouth in the shape of a "V" and stuck his tongue out. Plaintiff understood the gesture as imitative of oral sex on female genitalia, and believed it was directed toward her.

On February 28, 2020, Gomez approached plaintiff while she was seated at her workstation and requested to take a photo of her. She denied his request. Gomez proceeded to take the photograph anyway.

On March 2, 2020, plaintiff complained to Semar about Gomez's sexual harassment, which she could no longer tolerate. That day, she received a call from Panarese, who was assigned to investigate the conduct. Although UniFirst had a sexual harassment policy and investigative guidelines, Panarese had not seen them. UniFirst suspended Gomez during Panarese's investigation.

A-2963-22

Plaintiff recounted Gomez's sexual harassment to Panarese. Panarese also contacted Pistoia and Marotta, who confirmed plaintiff's account of Gomez's lewd gesture at the meeting. Panarese interviewed Gomez, who denied imitating oral sex during the meeting. According to Panarese's notes, Gomez said "oh wow. Definitely not . . . Would never do that . . . That's ridiculous . . . Would never do anything like that . . . [My t]ongue would never do that in a professional service." He admitted taking photographs of plaintiff, but said he did not do so over her objections.

Panarese found, despite his categorical denials, Gomez made the lewd gesture and took photos of plaintiff without her consent. At her deposition, Panarese testified she found plaintiff's account of what transpired with Gomez credible and corroborated by independent witnesses.

On March 5, 2020, after Panarese's investigation, UniFirst's management team convened a meeting at the Boston headquarters. Walker, Exline, LaMontagne, and Panarese were present. The group discussed Panarese's investigative findings and determined what actions would be taken.

UniFirst considered the three days Gomez was suspended without pay during the investigation to be an appropriate sanction and required him to retake the anti-harassment training course given annually to all employees. Finally,

8

UniFirst issued Gomez a "Final Letter of Understanding." The letter stated the investigation corroborated plaintiff's complaints Gomez made a lewd gesture at the meeting and took her photograph without consent. Although the letter noted Gomez had been suspended during the investigation it did not state the suspension was considered a sanction. The letter stated if Gomez was again found to have engaged in inappropriate conduct he would face progressive discipline up to and including termination.

UniFirst did not inform plaintiff of the outcome of the investigation. Apart from her interview with Panarese, plaintiff received no information from UniFirst about her complaint.

On March 6, 2020, plaintiff saw Gomez and Walker walking arm-in-arm and smiling at each other at the Whippany office. Plaintiff contacted Panarese by telephone to ask about the status of her complaint. Panarese told plaintiff a final decision had been made by UniFirst, Walker would be handling the matter, and he would be in touch with plaintiff later that day. Plaintiff, concerned about these developments, decided to record any conversation she had with Walker regarding her complaint.

Later that day, Walker called plaintiff into his office and, in an abrupt manner, asked her "what's up?" Plaintiff voiced her concern that no one from

UniFirst had communicated with her regarding the status of her complaint. Walker replied in a confrontational tone, "I was not about to call you," told her the complaint had been taken care of "internally," and said, "I think that should be good." Walker stated Gomez was suspended for three days and was on a "final written warning." When plaintiff asked Walker to clarify the effect of Gomez's punishment, he told her Gomez would be terminated if he "fucks up again." Walker informed plaintiff he did not "know the whole story," and rhetorically asked, "do I want to know the whole story?"

Plaintiff expressed her concern that the three-day suspension, which at that point had expired, was inadequate. She asked Walker, "how many . . . fuck ups do you guys need? I know [Gomez] has a whole history." Walker became indignant and advised plaintiff Gomez's history of sexual harassment should not have come up in her discussions with HR. Walker stated his intention was to "look out" for UniFirst's interests.

Plaintiff told Walker she did not want to be in the same room as Gomez in the future. She explained at her deposition she was concerned Gomez's behavior would continue and he would retaliate against her. Walker ignored plaintiff's statement. He told her she would be involuntarily transferred from the accounts for which Gomez was her supervisor and assigned to new accounts.

10

Interpreting such action as punishment, plaintiff asked why she, as opposed to Gomez, was being penalized and losing a client base she took a year to develop. Walker's response was to rhetorically ask, "yeah. So what, would we change routes the other way [and reassign Gomez]?" Plaintiff asked Walker, "what if I'm not okay with the decision?" Walker responded, "it is what it is."

Believing UniFirst was not going to protect her from future harassment or retaliation, plaintiff resigned. She testified, "I expressed my concerns numerous times to Walker, and he just shut me down, so how do I know that if [Gomez] retaliates [Walker's] not going to do the same thing? . . . That's why I left."

On August 3, 2020, plaintiff filed a complaint against defendants in the Law Division alleging claims of hostile work environment and constructive discharge pursuant to the LAD. After the matter was removed to the United States District Court and remanded back to the Law Division, plaintiff filed an amended complaint clarifying her aiding and abetting allegations as to the individual supervisor defendants.

Discovery revealed Gomez's 2020 performance review, which would have documented the investigation relating to plaintiff's complaint and UniFirst's response, was missing from his personnel file. Plaintiff's 2020 performance review was in her personnel file.

11

After discovery, defendants filed two summary judgment motions. The first was filed by the UniFirst Defendants. They argued a jury could not find them liable for plaintiff's claims because Gomez was not plaintiff's supervisor, UniFirst maintained an effective anti-harassment policy, and the company took appropriate remedial action to address plaintiff's complaints. In addition, the UniFirst Defendants argued there was no constructive discharge because plaintiff voluntarily left her employment immediately after she was informed of the company's response to her complaint.

The second motion was filed by Gomez. In addition to aligning himself with the UniFirst Defendants' arguments, Gomez argued he did not bear individual liability for plaintiff's claims because under the LAD he cannot aid and abet his own conduct.

Plaintiff opposed both motions. She argued Gomez was her supervisor and UniFirst was liable for the hostile work environment he created. She argued that the effectiveness of UniFirst's anti-harassment policy was subject to reasonable dispute, particularly in light of Gomez's status as a credibly accused and repeat sexual harasser. Plaintiff also argued UniFirst's response to her complaint was not effective and her only reasonable option was to resign. Finally, plaintiff argued the supervisors, including Gomez, aided and abetted the

A-2963-22

hostile work environment and thus bore individual liability under the LAD. In addition, plaintiff argued the absence of a record of the investigation, its findings, and the sanction imposed on Gomez was evidence UniFirst did not effectively enforce its anti-harassment policy.

In opposition to the motions, plaintiff relied in part on an expert report drafted by a proposed expert in HR training and investigations. The expert opined that: (1) UniFirst "deliberately refused to take reasonable action to stop the harassing behavior and prevent it from occurring in the future"; (2) by telling plaintiff he did not know and did not want to know the full story, Walker demonstrated he "had no intention of doing the right thing by any reasonably accepted standard for his behavior as manager"; (3) the actions taken by UniFirst after the investigation offered no explicit protection for plaintiff against any future contact with Gomez; and (4) UniFirst's actions "seem to have been taken with the sole goal of ensuring . . . Gomez would remain employed."

On May 12, 2023, the court issued an oral decision granting the summary judgment motions. The court's decision, in its entirety, follows:

> I'm going to grant the application to dismiss the complaint on both parties (sic) because I think, first of all, the management did what they were supposed to do. They investigated; they took immediate action. They suspended him for three days. And the fact that there's not a specific statement in his file is of no persuasion to

me because the payroll records clearly show that he was suspended for three days.

And to some extent I'm guessing, but the decision – once they made the decision to take the action they did, he had already been suspended for three days. So I suppose the fellow could have said and this will confirm he's already lost three days. That's – that's the issue. It's not a – not a big deal. He – as a fact, he was – he was suspended for three days. Action was taken.

I understand again, it's an employer's prerogative to decide whether . . . Gomez gets moved or whether she gets moved. They've offered a rational explanation. He was the one in charge of the files, not her. And it would have been more disruptive to move him than it would be to move her.

In terms of a constructive discharge, there has to be something that's so intolerable that it's unreasonable to expect somebody to stay. Her displeasure with the accommodation is not in any – by any means intolerable. And it's not a matter of a jury making that decision. It's very clear, she left immediately. There was not let me try it or something. Period, she's gone.

And in terms of . . . Gomez, there is a material fact as to whether he was a supervisor. But I still think – I do think that the claim as to him should also be dismissed because the – the company did everything they could do other than satisfy her very subjective objection to something that was not real.

So, for those reasons, I'll grant both applications dismissing the complaints (sic).

14

Two May 12, 2023 orders granted summary judgment in favor of defendants and dismissed the amended complaint.

This appeal followed. Plaintiff argues the motion court erred because genuine issues of material fact exist with respect to whether: (1) she was subject to a hostile work environment because of her sex; (2) Gomez was her supervisor; (3) the UniFirst Defendants had an effective anti-harassment policy in place and effectively responded to her complaint about Gomez; and (4) whether the defendants, including Gomez, are subject to individual liability for her claims.

II.

We review a grant of summary judgment de novo, applying the same standard as the motion court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"

15

Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the motion court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Self-serving assertions that are unsupported by evidence are insufficient to create a genuine issue of material fact. Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009). We review the record "based on our consideration of the evidence in the light most favorable to the parties opposing summary judgment." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523-24 (1995).

A-2963-22

Under the LAD it is unlawful to discriminate against a person in terms, conditions, or privileges of employment based on gender or sex. N.J.S.A. 10:5-12(a). The goal of the LAD is "nothing less than the eradication of the cancer of discrimination." Raspa v. Off. of Sheriff of Cnty. of Gloucester, 191 N.J. 323, 335 (2006) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). Strong public policy reasons support this goal. N.J.S.A. 10:5-3 ("[D]iscrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State."). "The law is thus intended to protect 'the civil rights of individual aggrieved employees' as well as 'the public's strong interest in a discrimination-free workplace.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 9 (2021) (quoting Lehmann v. Toys 'R' Us, 132 N.J. 587, 600 (1993)). Accordingly, "[t]he LAD is remedial legislation that should be liberally construed to advance its purposes." Rios, 247 N.J. at 10.

A. Hostile Work Environment.

To establish a cause of action under the LAD based on hostile work environment, plaintiff must satisfy four elements:

> Specifically, [she] must show that the complained-of conduct (1) would not have occurred but for [her] protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4)

the conditions of employment have been altered and that the working environment is hostile or abusive.

[Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24 (2002).]

The inquiry into what is severe or pervasive is intwined with whether a reasonable woman would believe the conditions of her employment are altered and the working environment is hostile. Lehmann, 132 N.J. at 604.

The LAD is not intended to be a general workplace civility code. Discourtesy or rudeness should not be confused with gender discrimination. Herman v. Coastal Corp., 348 N.J. Super. 1, 21 (App. Div. 2002); see also Shepherd, 174 N.J. at 25. The burden of proving discrimination "remains with the employee at all times." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005).

The motion court did not address these well-established factors or make any findings of fact or conclusions of law with respect to whether plaintiff raised a genuine issue of material fact relating to her hostile working environment claim. See R. 1:7-4(a) ("The court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right . . . ."). Having reviewed the record, we agree with plaintiff's argument

she raised genuine issues of material fact with respect to each <u>Shepherd</u> factor, precluding summary judgment.

First, defendants argue plaintiff cannot establish Gomez's behavior toward her was not based on her sex because Gomez took pictures of male employees as well as female employees and both men and women were present in the meeting room when he made the lewd gesture. Defendants argue plaintiff's subjective belief that Gomez directed his behavior toward her because of her sex is insufficient to overcome summary judgment. We disagree.

> [I]n order to state a claim under the LAD, a plaintiff [must] show by a preponderance of the evidence that she suffered discrimination because of her sex. Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex.
>
> [<u>Lehmann</u>, 132 N.J. at 604.]

However, to establish an LAD claim, "[a]ll that is required is a showing that it is more likely than not that the harassment occurred because of the plaintiff's sex." <u>Id.</u> at 605. The harassing conduct may or may not be sexual in nature, provided it occurs because of the victim's sex. <u>Id.</u> at 602.

19

Defendants' argument overlooks plaintiff's testimony Gomez told her he was sexually attracted to her and persistently commented on her appearance, and that she rebuffed his repeated requests to take her photo. A jury could reasonably determine Gomez's comments about plaintiff's appearance and his desire to take her photo were related to her sex, particularly in the absence of evidence Gomez commented on the appearance of male employees he photographed. In addition, Gomez's insistence on taking plaintiff's photograph despite her denial of consent could reasonably be interpreted by a jury as occurring because of her sex, as defendants produced no evidence of non-consensual photo taking by Gomez of male employees.

Plaintiff also testified Gomez looked directly at her when he made the lewd gesture. Her account of the incident was corroborated by the other employees who were present at the meeting. A jury could reasonably find her testimony credible. In addition, a jury could reasonably find Gomez's conduct at the meeting was directed at plaintiff because of her sex in light of his prior persistent comments about her appearance. A jury could also reasonably find the presence of other employees in the meeting room when Gomez directed his lewd gesture at plaintiff was evidence of his intention to humiliate plaintiff for

20

her refusal to permit him to take her photo and to cast her as an object of sexual desire in front of her coworkers.

Second, we agree with plaintiff's argument she raised genuine issues of material fact with respect to the remaining Lehmann factors.  When evaluating a hostile environment claim, we examine the severity or pervasiveness of the offending conduct under the totality of the circumstances, including:  (1) its frequency; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interfered with an employee's work performance.  Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008).  The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998) (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)).  The reasonable person standard does not allow "claims based on the idiosyncratic response of a hypersensitive plaintiff to conduct that is not objectively harassing . . . ."  Lehmann, 132 N.J. at 613.  It is possible one incident is severe enough to create a hostile environment.  Taylor v. Metzger, 152 N.J. 490, 499, 513 (1998) (county sheriff saying about an African American sheriff's officer "[t]here's the

jungle bunny" in presence of another supervisor was sufficient, standing alone, to create hostile environment).

Defendants argue even if plaintiff's allegations are accepted as true, Gomez's offending conduct was insufficient for a jury to find a reasonable person in plaintiff's position would objectively view the conduct as severe or pervasive enough to alter the conditions of her employment and create a working environment that was hostile or abusive.

In support of their argument, defendants note the lewd gesture happened only once and plaintiff did not immediately report it. In addition, they argue a jury could not reasonably find the gesture interfered with plaintiff's work, because she worked the remainder of the day it happened and an additional month thereafter. Defendants note that in response to Gomez's insistent attempt to take her photograph, plaintiff did not tell him to stop or that his behavior was offensive, electing instead to "ignore[] it, hoping he [would] stop." Defendants characterize Gomez's behavior as "benign" and "arguably not directed at plaintiff." We disagree.

A jury could reasonably find Gomez's lewd gesture, directed at plaintiff during a meeting with her coworkers present, standing alone, created a hostile work environment. The sexual gesture, like the racial slur in <u>Taylor</u>, is an

22

objectively crude and demeaning act by a supervisor in the presence of other employees that could reasonably be found to have only one purpose: to humiliate an employee and publicly announce that in their workplace they are not valued for their work, but are marked for derision and objectification based on a protected characteristic.

In addition, Gomez's crude gesture was not the only alleged act of discrimination. Plaintiff alleged Gomez repeatedly commented on her appearance, persistently asked to take her photograph, which he took despite plaintiff's refusal to consent to being photographed. A jury could reasonably find Gomez's insistent behavior created a hostile environment in which plaintiff was forced to work. Defendants' suggestion an employee must object to offensive behavior by a supervisor before she can assert a hostile environment claim is not supported by the text of the LAD or the published precedents interpreting the statute. A supervisor who mimics oral sex with a woman during a meeting with subordinates is not insulated from liability for the hostile environment caused by his lewd behavior because the female employee to whom the gesture was directed did not object at the moment the offensive conduct took

23

place. To hold otherwise would place the burden on the harassed employee to, in effect, warn her supervisor that his objectively harassing conduct is unlawful.[2]

## B. UniFirst Liability for Hostile Environment.

Under the LAD, an employer can be found liable for acts of unlawful employment discrimination by its employees. N.J.S.A. 10:5-12(a); Lehmann, 132 N.J. at 619. Employer liability attaches in several ways. First, an employer is subject to vicarious liability if a supervisor acted within the scope of their authority, where the employer delegated that authority, and the LAD violation was aided and abetted by that authority. Id. at 619-20.

Second, an employer may be vicariously liable for sexual harassment that occurs outside the scope of the supervisor's authority, if the employer had "actual or constructive notice of the harassment," or "if the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims." Id. at 624. As the Court explained, when an employer knows or should have known of harassment, but fails to take effective measures to stop it, the employer "has joined with the harasser in making the

---

[2] The motion court found plaintiff created a genuine issue of material fact with respect to whether Gomez was her supervisor. Because defendants did not file a cross-appeal, we do not address that issue.

working environment hostile . . . [and sent] the harassed employee the message that the harassment is acceptable and that the management supports the harasser." Id. at 623.

An employer is generally liable for a hostile work environment created by a supervisor "because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates the harassing conduct." Heitzman v. Monmouth Cnty., 321 N.J. Super. 133, 145 (App. Div. 1999) (quoting Lehmann, 132 N.J. at 620). Finally, "an employer's liability for its own negligence in failing to take effective remedial measures [is] a form of direct liability in addition to vicarious liability." Payton v. N.J. Tpk. Auth., 148 N.J. 524, 536 (1997).

We agree with plaintiff's argument she created genuine issues of material fact with respect to whether UniFirst had in place an effective remedial process and plan for responding to plaintiff's complaint against Gomez. The mere existence of UniFirst's anti-harassment policy is insufficient to insulate the company from liability. Lehmann, 132 N.J. at 623. "The efficacy of an employer's remedial program is highly pertinent to an employer's defense." Gaines v. Bellino, 173 N.J. 301, 314 (2002). An effective remedial program is one that is "reasonably calculated to end the harassment." Lehmann, 132 N.J.

at 623. The effectiveness of the employer's program is not gauged merely by the sanction imposed on the offender. Payton, 148 N.J. at 537. The inquiry must consider the process of investigation, including the "timeliness, thoroughness, attitude toward the alleged harassed employee, and the like . . . ." Ibid. As the Court explained, a remedial program that leaves the employee "exposed to continued hostility in the workplace" is ineffective. Id. at 538.

It is undisputed Gomez was disciplined for sexually harassing N.R. before he began harassing plaintiff. This fact alone creates a question as to the efficacy of UniFirst's anti-harassment policy because it is evident that UniFirst's prior sanction of Gomez was not effective. In addition, Gomez received a lesser sanction for his harassment of plaintiff than he did for his prior harassment of N.R. UniFirst issued a no-contact order for N.R., an employee Gomez did not supervise. However, it issued no such directive for plaintiff, an employee he did supervise. Apart from a three-day suspension, the only sanction imposed on Gomez for harassing plaintiff was to take, again, the annual anti-harassment training given to all employees.

In addition, while UniFirst removed plaintiff – not Gomez – from the accounts on which they both worked, it did not take steps to ensure plaintiff would not have to interact with Gomez in the future. In fact, it was undisputed

26

plaintiff would continue to be required to attend the weekly meeting (at which Gomez made his lewd gesture) with Gomez. Notably, while informing plaintiff of the actions taken against Gomez, Walker told her he did not "know the whole story" and suggested he did not want to know the extent of Gomez's conduct. A jury could reasonably find UniFirst did not take effective measures against Gomez and is, therefore, liable for the hostile work environment he created.

C. <u>Constructive Discharge.</u>

A constructive discharge under the LAD occurs when an "employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." <u>Shepherd</u>, 174 N.J. at 27-28. Constructive discharge is a "heavily fact-driven determination." <u>Muench v. Twp. of Haddon</u>, 255 N.J. Super. 288, 302 (App. Div. 1992) (quoting <u>Levendos v. Stern Ent., Inc.</u>, 806 F.2d 1227, 1230 (3d Cir. 1988)). Courts consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employers to the employee's complaint, and all other relevant circumstances. <u>Shepherd</u>, 174 N.J. at 28.

The record establishes plaintiff raised a genuine issue of material fact with respect to whether she was constructively discharged from UniFirst. On the day

27

she was informed of the action taken against Gomez, plaintiff saw Gomez and Walker walking into the office arm-in-arm, smiling at one another. Walker was cold and abrupt with plaintiff when he informed her of the outcome of the investigation, including that Gomez would be terminated only if he "fucks up" again. He told plaintiff he did not know or want to know the full story surrounding Gomez's harassing behavior. He also told plaintiff she would be reassigned from the client accounts she developed over the prior year and he would take no steps to keep her from coming into contact with Gomez in the future. A jury could reasonably find these facts are sufficient to constitute plaintiff's constructive discharge.

D. <u>Aiding and Abetting Liability.</u>

Finally, we address plaintiff's argument the motion court erred when it granted summary judgment to the UniFirst Defendants on her individual liability claims. "It shall be . . . unlawful discrimination . . . [f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden" under the LAD. N.J.S.A. 10:5-12(e). Such conduct may result in personal liability for the individual supervisor. <u>Tarr v. Ciasulli</u>, 181 N.J. 70, 83 (2004).

Aiding and abetting "require active and purposeful conduct."

[I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principle violation."

[Id. at 84 (quoting Hurley v. Atl. City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999)).]

For the reasons discussed in greater detail above, plaintiff raised genuine issues of material fact with respect to whether the UniFirst Defendants, who decided the discipline Gomez received and who oversaw the implementation of UniFirst's anti-harassment policy during the approximately one-year period during which Gomez harassed two employees, aided and abetted his unlawful acts.

With respect to Gomez's liability, we have not settled the question of whether an individual employee can be subjected to aiding and abetting liability for his own conduct. We have examined the issue in non-precedential opinions. The motion court did not address the legal issue, and we decline to decide the novel question on the undeveloped summary judgment record. We direct the trial court to address the issue on remand in the first instance.

29

The orders on appeal are reversed and the matter is remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-2963-22